**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**THOMAS JAMES ASSOCIATES, INC., Brian S. Thomas, James A. Villa, George Salloum and Joseph V. Gianni, Defendants.**

**No. CIV–90–316T.**

United States District Court, W.D. New York.

May 25, 1990.

S.E.C. (Joseph I. Goldstein, William H. Kuenhle, and Gary N. Sundick, of Counsel), Washington, D.C., Bradley E. Tyler, Asst. U.S. Atty., Rochester, N.Y., for plaintiff.

Pickard & Djinis (Anthony W. Djinis, of Counsel), Washington, D.C., Harris, Beach & Wilcox, Paul J. Yesawich, III, Dante Gullace, Rochester, N.Y., Finkelstein, Thompson & Loughran, Bernard John Barrett, Jr., and Steve Rosenberg, Washington, D.C., Special Counsel, for defendants.

## DECISION AND ORDER

TELESCA, Chief Judge.

### INTRODUCTION

Plaintiff Securities and Exchange Commission (the "Commission" or the "SEC") commenced this action March 29, 1990, with the filing of a complaint alleging various violations of the federal securities laws against the defendants, Thomas James Associates, Inc. ("TJA"), Brian S. Thomas ("Thomas"), James A. Villa ("Villa"), George Salloum ("Salloum"), and Joseph V. Gianni ("Gianni"). The complaint seeks permanent injunctive relief as well as various forms of ancillary relief, including the disgorgement of profits accruing to the defendants by virtue of those activities violative of federal securities laws.

Simultaneous with the filing of the complaint, the SEC applied for, and was granted, a temporary restraining order freezing the assets of defendants, enjoining violations of federal securities laws pending a final determination of this action, and appointing a special counsel for review of TJA's securities practices and its expenditures. By consent of the parties and in accordance with Fed.R.Civ.P. 65(a)(2), the trial of this action on the merits was advanced and consolidated with the hearing

of the application for a preliminary injunction, and a hearing date set for May 23, 1990. A subsequent change in the Court's calendar permitted that date to be advanced to May 14, 1990.

On or before the first day of testimony, the parties had largely resolved the case. A stipulation of dismissal was entered as to defendant Gianni; a final judgment of permanent injunction was entered as to defendant Salloum; and final orders of permanent injunction were entered as to defendants TJA and Villa. Thus, the issues to be tried and determined were the liability for securities violations of defendant Brian S. Thomas and the amount of disgorgement, if any, to be assessed against defendants TJA, Villa, and Thomas. At the close of Mr. Thomas' direct examination by counsel, he consented to the entry of a permanent injunction and a lifetime bar from employment in the securities market as to himself. Therefore, the only issue remaining for the Court's determination is the appropriate amount of disgorgement to be assessed against defendants TJA, Villa, and Thomas.

For the reasons discussed below, I find that disgorgement in the amount of $1.5 million is proper; defendant Thomas James Associates, Inc. to pay disgorgement in the amount of $300,000; defendant Villa to pay disgorgement in the amount of $400,000; and defendant Thomas to pay disgorgement in the amount of $800,000.

### I. FINDINGS

#### A. Background [1]

This action arises from a series of four initial public offerings ("IPOs") which TJA underwrote during 1989 for the following companies: Sunrise Technologies, Inc., Phoenix Laser Systems, Inc., Megamation, Inc., and International Superconductor Corp. These IPOs were declared effective, respectively, in May, August, September, and December of 1989. The gist of the SEC's claim is that TJA, together with its

1. This section of the decision derives largely from the complaint, the allegations of which defendants TJA, Thomas, and Villa have accepted as true for purposes of determining this disgorgement claim.

two principals, Brian Thomas and James Villa, its head trader, George Salloum, and its director of sales, Joseph Gianni, participated in a scheme to manipulate the market for these stocks; that the scheme was effected by means of dominating and controlling the supply, the demand, and the price of these stocks in order to permit TJA to charge excessive markups in the initial aftermarket and thereby reap an illegal profit.

While variations existed among the IPOs, including the number and price of shares and warrants in the initial offerings and whether TJA acted as a market maker for a particular offering, the IPOs and their respective initial aftermarkets were remarkably similar.

TJA directed its registered representatives (or "sales reps") to take indications of interest for the "units" of each of these IPOs several days to several weeks before the anticipated effective date of their respective registration statements. These "units" were a predetermined number varying among the IPOs, of both shares of common stock and warrants. The registered representatives secured from customers a total dollar amount that such customers were willing to invest in both an IPO and its aftermarket. Using this dollar amount, the registered representatives computed the number of "units" to be recorded as each customer's indication of interest.

TJA, specifically through Brian Thomas, caused registered representatives to oversell each offering substantially above the number of securities units actually available in order to create an artificial demand for the securities in the aftermarket.

Customers were instructed to send checks immediately to TJA, prior to the effective date of the registration statement, in an amount equal to the dollar amount of the customer's indication of interest. At that time, TJA executives were well aware that the dollar amount far exceeded the price of the number of units the customer would be allocated in the IPO. Customers were strongly advised to permit their sales reps to invest in the immediate aftermarket the difference between the dollar amount of each customer's indication of interest and the cost of the number of units actually allocated to that customer in the IPO.

The actual allocation to customers of IPO units was determined solely by Brian Thomas. The "general masses" received far less than the amount of stock in which they had indicated an interest to purchase—on the average, less than $1,000 worth; a far more generous allocation, called the "sprinkle," was made to TJA management, including managers of branch offices which had been most active in the IPO. These units were allocated to accounts designated by Thomas, Villa, and other members of TJA's management and over which they exercised direct or indirect control.

Having secured control over virtually all of the securities units in an IPO, TJA directed its sales representatives to contact customers again in order to stir up even more interest in the issue based on the market for the initial offering. In reality, of course, that market was at all times entirely controlled by TJA itself. Before the effective date of the offering and before aftermarket trading had commenced, TJA's registered representatives accepted orders for aftermarket trades.

In each case, the aftermarket did not commence immediately after an IPO was declared effective. TJA used an additional period of time, ranging from a number of hours to two full days, to solicit and collect further market orders from its customers.

When aftermarket trading commenced, the common stock and warrants which comprised the securities units were traded separately. In each case, TJA caused shares and warrants to be sold back to it from the "sprinkle" accounts at a nominal profit (as little as $0.125 per share or warrant). Since TJA had never actually relinquished dominion and control over the shares and warrants allocated to the "sprinkle" accounts, TJA's subsequent repurchase of the common stock and warrants occurred prior to the completion of the distribution of the IPO.

TJA's admitted manipulation of the securities themselves, including both its sales tactics and use of the select "sprinkle" accounts, caused the price of the securities to rise upon the opening of the aftermarket. At these artificially inflated prices, TJA filled the waiting purchase orders of its customers from its own private reserve of common stock and warrants and, in the first three days of trading of the four IPOs, garnered for itself several million dollars in excessive markups.

The SEC originally computed TJA's illegal markup at $4.5 million. TJA's comptroller, however, estimated[2] the firm's gross revenue from the first three days' trading of these four IPOs to be $2.3 million. He testified that this lower figure for gross revenue was adjusted by the actual values at which TJA covered its short positions on the issues, in some cases many weeks after the opening of trading.

In response to the testimony of TJA's comptroller, the SEC proffered testimony that TJA's profits for the first three days of trading in these four IPOs are best determined by figuring that TJA consistently covered its short positions at the bid price, rather than the ask price, of the stock. Using this method of computation, the SEC determined TJA's total gross revenues from the first three days of trading of these four underwritings to be approximately $3 million.

### B. The Court's Findings

As previously stated at footnote 1, the posture of this case, including the entry of consent orders signed by defendants TJA, Villa, and Salloum; the entry of an order of dismissal as to defendant Gianni; and the statements of defendant Thomas, made on the record at the close of his direct examination, to the effect that he accepted both the entry of a permanent injunction against himself and the imposition of a lifetime bar from the securities industry, obviates the need for this Court to make findings concerning many of the issues which were originally in this case. For the purposes of determining the remaining claim for dis-

gorgement, defendants TJA, Villa, and Thomas concede the facts as stated in the complaint; defendant Thomas has further conceded the issue of scienter for a similar limited purpose. Thus, the focus of my findings is not the issue of liability, which defendants effectively have conceded; rather, their sole focus is whether disgorgement is a proper remedy in this case and, if so, to what extent.

■ Thomas James Associates, Inc. is a small over-the-counter brokerage firm. While defendants Brian Thomas and James Villa each own 50% of the stock of this sub-chapter S corporation, it is Brian Thomas who created TJA and who manifestly controlled it prior to the commencement of this action. During 1989, Thomas functioned not only as the president of TJA but also as its "untitled sales manager." Thomas put these four IPOs together; he set their terms, created markets for them, and controlled the markets which he had created, for the unjust enrichment of TJA.

Although Brian Thomas was the dominant figure in TJA and orchestrated these four IPOs, he is not to be the sole source of recoupment of any realized unjust enrichment. Because of its stature in the market, TJA provided to Thomas the means for implementing the scheme; having chosen not to contest its liability in this matter, the firm cannot now be heard to deny responsibility for a portion of the restitutionary relief sought by the SEC. Similarly, defendant Villa cannot escape responsibility for the profits accrued through this illegal scheme; he enjoys both a 50% ownership interest in the firm and a long, close personal and business relationship with defendant Thomas. At various times in 1989, Villa assumed responsibilities for TJA's sales activities and for its compliance with securities laws and regulations. Villa transferred his responsibility for sales to defendant Thomas, knowing full well that Thomas' predilection for aggressive salesmanship would make compliance oversight all the more crucial. That oversight, for which Villa was responsible, was virtually

---

2. The basis for the remainder of this section of the decision is the testimony of plaintiff's witness Robert Lowry and defendants' witness Jeffrey Spire.

nonexistent with regard to the execution of these four IPOs.

The combined actions and inactions of defendants TJA, Villa, and Thomas warrant disgorgement of illegal profits. The measure of that disgorgement remains to be fixed.

Initially, I reject the SEC's proffer of a gross profit figure of $4.5 million. While the testimony of Robert Lowry supports the computational correctness of that figure, I have been provided with absolutely no evidence—e.g., balance sheets or banking information—to suggest that it represents anything other than a theoretical construct. As such, it provides no basis for real dollar restitution. As discussed more fully below, I also reject TJA's proffer of a gross profit figure of $2.3 million.

I find that an appropriate basis from which to determine the amount to be disgorged is $3 million. The record establishes to my satisfaction that such amount represents TJA's total gross revenues from the first three days of trading of each of the four underwritings. The complaint itself limits its request for disgorgement to those profits illegally garnered during the first three days of trading in each issue, and fixes that amount at $4.5 million. *See* Complaint, ¶¶ 50, 56 and § XI. The SEC's own testimony, however, persuades me that such profits amounted to $3 million, rather than $4.5 million. *See* Plaintiff's Exhibit 132.

The SEC's analysis by which it derived this figure is particularly credible; plaintiff's witness Lowry testified that it represented the difference between the bid price of each stock and the price at which TJA almost contemporaneously sold stock to its customers. Lowry argued that use of the bid price, that is the lower price, as TJA's cost of the stock was appropriate, notwithstanding TJA's assertion that it had covered its short position in several of the stocks at significantly higher prices, resulting in diminished profits. Given TJA's total and unbroken control over all relevant market forces affecting these stocks within the initial aftermarket, TJA could have purchased all of the shares it needed at the lowest price possible. That it chose to do otherwise, for whatever reasons, is simply not relevant to a determination of the profits it garnered from its manipulation of these four IPOs.

I find that it is appropriate to offset these gross profits from the four IPOs with certain business expenses attributable thereto by TJA. These expenses include, for example, commissions, telephone charges, underwriting expenses and a proportionate share of overhead. Other than testimony indicating that TJA commissions on the four IPOs ran to a figure approximating 16% of the gross revenues rather than 46% as stated by TJA itself, the SEC neither proffered its own evidence concerning TJA expenses nor rebutted the statement of such expenses included in defendants' Detailed Revenue and Expense Analysis for the year 1989. Having reviewed those figures, and for purposes of determining fairly the disgorgement to be paid, I reduce TJA's gross revenues from the four IPOs by 50%, in order to reflect a fair setoff for necessary business expenses.

I also find it appropriate to reduce the amount of disgorgement to be paid by the defendants in view of the other terms and conditions for resolving this case which the SEC has demanded and to which the defendants have acceded. Defendants TJA, Villa, and Thomas are permanently enjoined from future violations of the federal securities laws; any violation in the future will expose the defendants not only to the renewed scrutiny of the SEC but also to potential charges of contempt. Brian Thomas has consented to a life-time bar from active participation in the securities industry; he has transferred active control of his 50% interest in TJA to the Special Counsel appointed in this case. The defendants' professional and personal reputations have been called into question by this litigation, *see* Ellsworth, *Disgorgement in SEC Action*, 1977 Duke L.J. at 661 (effect of adverse publicity is a cost to be charged off against disgorgement).

In fixing the amount of disgorgement to be paid directly by TJA, I further take into

account that the firm provides employment for 300 individuals in a number of states; that, prior to this litigation, it had enjoyed a relatively clean record with both the SEC and the industry's self-regulating bodies; and that it fills a niche in the capital markets as a company willing to underwrite highly speculative, but credible, companies. I further note that no private actions arising from these IPOs have been filed against TJA and that the four issues continue to trade at or above their initial ask price.

In fixing the amount of disgorgement to be paid by defendants Villa and Thomas, I take into account that they are equal partners in the business; that Brian Thomas has both directed and dominated the business; that defendant Villa's role, while less forceful, required him to have a knowledge of the workings of the firm which should have alerted him to the existence of this ongoing fraudulent scheme; and that he, like Mr. Thomas, has profited enormously from the business.

## II. APPLICABLE LAW

The record of this case which I have just summarized is not disputed; it justifies an order of disgorgement against defendants TJA, Thomas, and Villa. *See In re Alstead, Dempsey & Co.*, 30 SEC Docket 208 (1984), citing at f.n. 6 *Barnett v. U.S.*, 319 F.2d 340, 344 (8th Cir.1963). In determining the actual amounts to be disgorged from the defendants, I am guided by principles of equity.

■ Federal securities law invokes the equity jurisdiction of the district court. Once that jurisdiction is invoked, the court has power to order all necessary equitable relief.

> Such discretion in fashioning appropriate remedies is a necessary (if unspoken) concomitant of the legislative grant of power to enforce the laws. *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985).

While the main thrust of enforcement in federal securities law is injunctive in nature, "the SEC may seek other than injunctive relief in order to effectuate the purposes of [federal securities law], so long as such relief is remedial relief and is not a penalty assessment." *SEC v. Texas Gulf Sulphur*, 446 F.2d 1301, 1308 (2nd Cir.), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971). The Second Circuit has recognized that,

> [t]he sweeping mandate manifests in the securities laws would be all but meaningless were it not for the broad investigatory and enforcement powers created under the statutory scheme.... A trial judge is invested with considerable discretion in granting injunctive relief.... Moreover, once the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances. Citation omitted. *SEC v. Materia*, 745 F.2d at 200.

This power is necessary to promote the most efficient and effective enforcement of federal securities law, and both the SEC and private litigants may have recourse to court. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103–04 (2nd Cir.1972). Thus, the enforcement of federal securities laws must comport with both Congressional intent and equitable principles, for

> [w]hen Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes. *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291–92, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960).

Notwithstanding the absence of specific statutory authority in federal securities laws, the power of the SEC to seek the specific equitable relief of restitution is well established. *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d at 1307.

The primary purpose of this disgorgement is also well established:

> [It] is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched. *SEC v.*

*Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2nd Cir.1978); *see also SEC v. Tome*, 833 F.2d 1086, 1096 (2nd Cir.1987), *cert. denied sub nom. Lombardfin S.p.A. v. SEC*, 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988).

As recognized by both the courts and various commentators, determining that disgorgement is an appropriate remedy in this case does not necessarily determine the measure of that disgorgement. *See SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1230 (D.C.Cir.1989); *see* Farrand, *Ancillary Remedies in SEC Civil Enforcement Suits*, 89 Harv.L.Rev. 1779 (1976); *Note, The Measure of Disgorgement in SEC Enforcement Actions Against Insider Traders Under Rule 10b–5*, 34 Cath.U.L.Rev. 445 (1985); *Note, Equitable Remedies In SEC Enforcement Actions*, 123 U.Pa.L.Rev. 188 (1975); Ellsworth, *Disgorgement in Securities Fraud Actions Brought by the SEC*, 1977 Duke L.J. Nor do I find much guidance on this issue in cases stating that the amount to be disgorged is the amount of illegal profits. *See, e.g., SEC v. Materia*, 745 F.2d at 200 ("disgorgement of illegally obtained profits …"); *SEC v. Manor Nursing Centers*, 458 F.2d at 1104 (requiring disgorgement of "proceeds received in connection with" an illegal stock offering); *SEC v. Texas Gulf Sulphur*, 446 F.2d at 1308 ("restitution of the profits on these [illegal] transactions …"); *SEC v. Tome*, 833 F.2d at 1096 (2nd Cir.1987) ("[the defendants must] disgorge a sum of money equal to all the illegal payments they received.")

■ In fixing the measure and amount of disgorgement, I may not invoke the equitable power of the court in order to inflict a penalty or effect a forfeiture; the amount to be disgorged must be "causally related to the wrongdoing." *SEC v. First City Financial Corp.*, 890 F.2d at 1230. Such amount, however, need not be figured with perfect precision; "disgorgement need only be a reasonable approximation of profits causally connected to the violation." *Id.* at 1231.

The SEC bears the ultimate burden of persuasion that its disgorgement figures reasonably approximate the amount of unjust enrichment. *Id.* at 1231. In this case, the SEC's initial figures fixing the amount to be disgorged at $4.5 million are nothing more than a theoretical construct. The defendants themselves provided the evidentiary basis for the SEC's claim when it admits to gross profits from the four IPOs in the amount of $2.3 million, and states the manner in which TJA's accountant arrived at such figure. Provided with this admission, the SEC was able to argue credibly that the gross profit could be adjusted as discussed *infra* at 16. *Cf. First City Financial Corp.*, 890 F.2d at 1231.

The SEC further argues, however, that the amount to be disgorged by defendants is the entire amount of excessive markups, because the measure of disgorgement is the injury to the market, and because only the gross profits, unadjusted for expenses, adequately reflect such injury. The SEC's argument simply misconstrues both the nature and extent of the equitable power of the Court to order disgorgement.

The purpose of disgorgement is inherent in its name: to divest wrongdoers of their illegal profits. It is a judicial exercise of the chancellor's discretion to prevent unjust enrichment. *SEC v. Commonwealth Chemical*, 574 F.2d at 95.

In determining the proper amount of restitution, a Court may consider as an offset the sums which a defendant paid to effect a fraudulent transaction. *See* Restatement of Restitution, ch. 7 (1937); *see also* Ellsworth, *Disgorgement in Securities Fraud Actions Brought by the SEC*, 1977 Duke L.J. 641, 651.

Even where Congress has expressly provided a disgorgement remedy in a statutory context, as in the area of trademark infringement, it has provided that a violator is entitled to set off all proven costs or deductions against the profits accruing from his violation. *See, e.g.,* 15 U.S.C.A. § 1117 (West 1982 and Supp.1990); *see also Aladdin Manufacturing Co. v. Mantle Lamp Co. of America*, 116 F.2d 708 (7th Cir.1941) (disgorgement of profits from

trademark infringer necessarily involves deduction of the cost of the realization of those profits.)

In this case, the SEC seeks disgorgement of a broker-dealer's excessive markups. These markups are a function of the way a securities firm does business, and thus have corresponding costs and expenses related to them. This is not to say that securities law violators may insulate certain profits from disgorgement because they were earned in the ordinary course of business and not in furtherance of arguably more egregious forms of securities fraud, such as insider trading. *Cf. First City Financial Corp.*, 890 F.2d at 1230–31; *see also* Comment, *The Measure of Disgorgement in SEC Enforcement Actions Against Insider Traders Under Rule 10b–5*, 34 Catholic University L.R. 445 (1985).

Nor may a securities law violator avoid or diminish his responsibility to return his ill-gotten gains by establishing that he is no longer in possession of such funds due to subsequent, unsuccessful investments or other forms of discretionary spending. *See e.g., SEC v. Shapiro*, 494 F.2d 1301, 1309 (2nd Cir.1974) ("[Defendant's] additional losses resulted not from any penalty imposed by the Court but from his unwise investment decision to keep the stock after [the date the inside information became public].... [A] contrary holding would create a serious anomaly that might encourage insider trading. To require disgorgement only of actual profits in cases where the price of the stock subsequently fell would create a heads-I-win-tails-you-lose opportunity for the violator: he could keep subsequent profits but not suffer subsequent losses.")

█ In holding that, when exercising its equity jurisdiction to order disgorgement of unjust enrichment, a court may consider as an offset the expenses incurred by defendant in garnering such unjust enrichment, I acknowledge that securities law violations may exist in which disgorgement is properly ordered in the amount of the total gross profits. *See e.g., SEC v. R.J. Allen and Associates, Inc.*, 386 F.Supp. 866 (S.D.Fla.1974) (disgorgement ordered of all proceeds received in a fraudulent scheme aimed at least in part at former prisoners of the Viet Nam war who had accumulated, and lost, substantial sums of back pay.)

### III. CONCLUSION

In determining the appropriate relief in a case of securities fraud, every court attempts to fashion a remedy which comports with economic reality, congressional intent, and equitable principles. Under the circumstances of this case, I am convinced that the calculus of disgorgement must consider both defendants' profits and their expenses.

WHEREFORE, defendants shall pay disgorgement in the following amounts:[3] Brian Thomas in the amount of $800,000; James Villa in the amount of $400,000; and Thomas James Associates, Inc. in the amount of $300,000.

The SEC is directed to prepare separate order/s providing for a plan of distribution of the disgorgement funds and for vacatur of the order of this Court of April 4, 1990. Upon entry of such separate orders, the parties may settle final judgments in accordance with this decision.

ALL OF THE ABOVE IS SO ORDERED.

---

**3.** In accordance with my findings and the applicable law, I deny the SEC's request for prejudgment interest. *Cf. SEC v. Stephenson,* 732 F.Supp. 438, 439 (S.D.N.Y.1990) and cases cited therein.