**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SECURITIES AND EXCHANGE
COMMISSION,
              *Plaintiff-Appellee,*

              v.

JT WALLENBROCK & ASSOCIATES;
CITADEL CAPITAL MANAGEMENT
GROUP, INC.,

              *Defendants,*

              and

LARRY TOSHIO OSAKI; VAN Y.
ICHINOTSUBO,
              *Defendants-Appellants.*

No. 04-55100

D.C. No.
CV-02-00808-ER

OPINION

Appeal from the United States District Court
for the Central District of California
Edward Rafeedie, District Judge, Presiding

Argued and Submitted
October 17, 2005—Pasadena, California

Filed March 10, 2006

Before: Andrew J. Kleinfeld, A. Wallace Tashima and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

## COUNSEL

Huey P. Cotton and Christine E. Field, Cozen O'Connor, Los Angeles, California, for the defendants-appellants.

Mark Pennington, Assistant General Counsel, Securities and Exchange Commission, Washington, D.C., for the plaintiff-appellee.

## OPINION

FISHER, Circuit Judge:

At issue is an order entered against parties to a securities pyramid or Ponzi scheme, requiring the principal and his two companies, jointly and severally, to disgorge millions of dollars that the district court found to be ill-gotten gains from their having defrauded numerous investors. The defendants are J.T. Wallenbrock & Associates ("Wallenbrock") and Citadel Capital Management Group, Inc. ("Citadel"), business entities that were organized and controlled by appellant-defendant Larry Osaki, the managing general partner of Wallenbrock and a 99.5 percent owner of Citadel (collectively "the defendants").[1] Another appellant-defendant is Van Ichi-

---

[1] Although Citadel was a named defendant in the SEC's complaint, the SEC requests that we dismiss Citadel's appeal because the notice of appeal does not name Citadel in either the caption or the body of the notice as required by Fed. R. App. P. 3(c)(1)(A). In their reply brief, the defendants concede that the appellants include only Wallenbrock, Osaki and Ichinotsubo. Our disposition of the case ultimately renders this issue moot. Because Citadel was a named defendant in the complaint, we include Citadel as a "defendant" in this opinion.

notsubo, an employee of both companies who solicited investors on their behalf and invested $1.2 million in Wallenbrock.[2] We affirm the district court's disgorgement order.

## I.    Factual and Procedural Background[3]

From at least 1997 to October 2003, the defendants raised nearly $253.2 million from thousands of investors through the fraudulent sale of unregistered promissory notes.[4] The defendants misrepresented to investors that they were using the proceeds of the notes, matched by Wallenbrock, to purchase accounts receivable of Malaysian latex glove manufacturing companies and that the investments would yield returns of 15-20 percent every 90 days. The defendants told investors that there was little or no risk in the Wallenbrock investments and emphasized the safety of profits. In fact, the defendants did not purchase such receivables but instead used the investors' funds to engage in a high-stakes Ponzi scheme and invest in speculative business ventures.[5]

---

[2]We also include Ichinotsubo in our reference to "the defendants."

[3]The undisputed facts are based on the allegations in the SEC's complaint and the district court's disgorgement order. In accordance with a February 28, 2003 order of permanent injunction, the defendants are precluded from denying or arguing that they did not violate federal securities law in the manner set out in the SEC's complaint.

[4]According to the "Accounting of Investor Funds" prepared by a forensic certified public accountant ("CPA") on behalf of the court-appointed receiver, this amount included $229.2 million received from individuals and companies and $24.0 million from investors' IRA and other retirement accounts. The Accounting of Investor Funds summarizes the findings of the CPA's comprehensive accounting of Wallenbrock and Citadel based on records provided by the defendants.

[5]As the SEC's complaint explains, the defendants have "no evidence confirming that [investor] funds were being invested as represented or confirming the source of funds returned as profit or repayment of principal to investors." For example, the defendants have "no documentation showing any ownership interest in accounts receivable" and "no documentation confirming the use of investor funds, such as schedules reflecting the purchase of receivables, dates payments were expected or received on receivables and information on defaults."

Wallenbrock first deposited the investors' $253.2 million in Osaki's Wallenbrock checking account. The defendants then used $113.8 million of these funds to pay investors their "returns," maintaining the illusion that the defendants were actually making the investments as represented. Of the remaining $139.4 million, the defendants spent $11.1 million to cover operating expenses for both Citadel and Wallenbrock, including expenses such as office space and payroll for over 60 employees of both companies, and $25.5 million to pay for various Wallenbrock operating expenses and Osaki's personal expenses.[6] Wallenbrock also spent $99.8 million to fund over 175 start-up companies on Citadel's behalf, of which Citadel was obligated to repay Wallenbrock $71.2 million plus 10 percent annual interest.[7] The remaining $3.0 million was still in Osaki's Wallenbrock checking account as of December 2001.

---

[6]Because of the large volume of transactions, the commingled use of funds and the inadequacies in Wallenbrock's accounting, the forensic CPA was unable to ascertain what amount of the $25.5 million in payments were for personal or for business expenses. For example, included in these payments were items that could be personal expenses of Osaki such as over $1.5 million in payments to at least 10 credit card companies and approximately $1.5 million in cash withdrawals.

[7]The defendants assert that Wallenbrock loaned $131.0 million to Citadel for its investment business, rather than $99.8 million. They support this assertion by relying on an unverified one-page accounting they provided to the district court in February 2002 and numerous one-paragraph promissory notes dated between October 1, 1996 and December 31, 2001 that obligate Citadel to pay Wallenbrock several million dollars "for value received." However, it is unclear how the defendants arrive at their $131.0 million figure, and the record shows that Citadel was obligated to repay Wallenbrock only $71.2 million "for value received." In addition, the CPA's detailed accounting shows that Wallenbrock spent only $110.8 million related to Citadel, $99.8 million of which went directly to start-up companies on Citadel's behalf. In any event, the defendants' argument that the district court should have deducted the loan to Citadel — whatever its amount — from the disgorgeable gain lacks merit. *See* Section III.A.2, *infra*.

In January 2002, the SEC brought a civil enforcement action against the defendants alleging violations of the anti-fraud, broker-dealer registration and securities registration provisions of the federal securities laws.[8] The district court granted the SEC's request for an asset freeze and temporary restraining order enjoining future violations, and appointed a receiver on February 21, 2002. In May 2002, the defendants consented to a preliminary injunction. After we affirmed the district court's denial of the defendants' motion to dismiss in *SEC v. Wallenbrock*, 313 F.3d 532 (9th Cir. 2002), the defendants, in February 2003, settled with the SEC by consenting to entry of a permanent injunction against future violations. The injunction order authorized the district court to determine the amounts of disgorgement, plus prejudgment interest and civil penalties to be imposed on the defendants "as a result of the conduct alleged in the Commission's complaint." The injunction order also precluded the defendants from "denying or arguing that they did not violate the federal securities laws in the manner set out in the Commission's complaint," but did not preclude defendants from "presenting evidence as to whether and what amount of disgorgement, prejudgment interest and civil penalties are appropriate."

In December 2003, the district court granted the SEC's motion for disgorgement. The court found that Osaki and Ichinotsubo operated a Ponzi scheme through Wallenbrock and Citadel, repaying to investors $113.8 million of the $253.2 million raised and spending $136.4 million of the investor funds "for their own benefit."[9] In its order, the court imposed (1) disgorgement against Wallenbrock, Osaki and

---

[8]15 U.S.C. §§ 77e(a), 77e(c), and 77q(a) (1933 Act); 15 U.S.C. § 78j(b) (1934 Act); and 17 C.F.R. § 240.10b-5.

[9]The amount "spent" by the defendants included the $36.6 million in Wallenbrock and Citadel operating expenses and the $99.8 million paid to start-up companies. The remaining $3.0 million in Osaki's Wallenbrock checking account had been frozen and transferred to a receivership shortly after the SEC filed its complaint.

Citadel, jointly and severally, of $139.4 million (the entire proceeds from the scheme less amounts paid to investors) plus prejudgment interest of $24.3 million, minus any disgorgement payments made by Ichinotsubo; (2) disgorgement against Ichinotsubo of $409,798 (the amount he received from the proceeds of the scheme) plus prejudgment interest of $85,435; and (3) a civil penalty of $100,000 each against Osaki and Ichinotsubo pursuant to 15 U.S.C. § 78t(d)(2)(c) and 15 U.S.C. §78u(d)(3)(B)(iii).[10] The defendants have appealed only the district court's calculation of disgorgement assessed against each of them.

## II.   Jurisdiction and Standard of Review

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We review the district court's order of disgorgement for abuse of discretion. *SEC v. First Pac. Bancorp*, 142. F.3d 1186, 1190 (9th Cir. 1998).

## III.   Discussion

The defendants argue that the district court abused its discretion in refusing to deduct $36.6 million in Wallenbrock and Citadel business and operating expenses from the disgorgement amount. They also contend that Wallenbrock loaned $131.0 million to Citadel for "business operations-capital investment," which the district court improperly included as disgorgeable gain. Finally, the defendants claim that Wallen-

---

[10]On March 22, 2005, Osaki pled guilty to conspiracy to commit securities fraud, two counts of securities fraud, obstruction of justice and one count of money laundering in relation to the pyramid scheme. *See* U.S. Department of Justice Press Release, March 22, 2005, *available at* http://www.usdoj.gov/usao/cac/pr2005/051.html. Osaki acknowledged that he relocated operations to Canada, Belize and elsewhere after consenting to the permanent injunction. *Id.* On December 16, 2005, Osaki was sentenced to 20 years in federal prison and ordered to pay more than $145 million in restitution to his victims. *Id.*

brock received $23.0 million from business operations unrelated to income from defrauded investors, that the district court should not have ordered disgorged. Each of these arguments lacks merit.

### A. Determining "ill-gotten gains" and "unjust enrichment"

**[1]** As we made clear in *First Pacific Bancorp*, the district court has broad equity powers to order the disgorgement of "ill-gotten gains" obtained through the violation of federal securities laws. 142 F.3d at 1191; *see also SEC v. Colello*, 139 F.3d 674, 679 (9th Cir. 1998) ("To order disgorgement, the district court . . . . need find only that [the defendant] has no right to retain the funds illegally taken from the victims."). "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *First Pac. Bancorp*, 142 F.3d at 1191 (citing *Hateley v. SEC*, 8 F.3d 653, 655 (9th Cir. 1993)). The district court also has broad discretion in calculating the amount to be disgorged. *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996). A disgorgement calculation requires only a "reasonable approximation of profits causally connected to the violation," *First Pac. Bancorp*, 142 F.3d at 1192 n.6 (internal citation omitted), and the amount of disgorgement should include "all gains flowing from the illegal activities." *SEC v. Cross Fin. Servs.*, 908 F. Supp. 718, 734 (C.D. Cal. 1995).

**[2]** The essence of the defendants' scheme was to obtain investors' money under false pretenses in order to fund the defendants' speculative business ventures. Rather than put their own money at risk, the defendants benefitted from the use of investors' money to spend at the defendants' discretion — whether to cover operating expenses, invest in start-up companies, pay personal expenses or to pay fake returns to investors to perpetuate the fraud. *Cf. SEC v. Great Lakes Equities Co.*, 775 F. Supp. 211, 215 (E.D. Mich. 1991) (rea-

soning that where a defendant's use of fraudulently obtained funds is "to defray obligations of the wrongdoer, the wrongdoer is benefitted by those expenditures"). Given these circumstances, all $253.2 million obtained from investors was an ill-gotten gain that unjustly enriched the defendants.

### 1. *Business and Operating Expenses*

[3] It follows that it would be unjust to permit the defendants to offset against the investor dollars they received the expenses of running the very business they created to defraud those investors into giving the defendants the money in the first place. *Cf. SEC v. TLC Invs. & Trade Co.,* 179 F. Supp. 2d 1149, 1157 (C.D. Cal. 2001) (concluding that "expenses in carrying out a fraudulent scheme . . . are hardly appropriate or legitimate deductions") (internal citation and quotation omitted).

[4] This is not the case of a partially legitimate company misdirecting or misappropriating revenues. For example, if an investor buys stock through a licensed broker who then skims off some or all of the profits generated by the stock, either through dividends or upon resale, the broker is enriched by the amount skimmed. Under some circumstances, the broker might be entitled to offset expenses customarily incurred in the purchase and sale of such stock if the investor would have had to pay for such expenses in any legitimate transaction. For example, in *SEC v. Thomas James Assocs., Inc.*, 738 F. Supp. 88, 89-90 (W.D.N.Y. 1990), the district court ordered the defendants (including a brokerage firm) to disgorge the illegal profits reaped by their manipulation of the market to "charge excessive markups in the initial aftermarket" of four initial public offerings.[11] In assessing disgorgement, the court

---

[11]The defendants' scheme in *Thomas James* was implemented by dominating and controlling the supply and demand of the stocks, causing their price to rise upon the opening of the aftermarket. 738 F. Supp. at 89-91. At these "artificially inflated prices," the defendants filled the waiting purchase orders of its customers from their own private reserve of securities units. *Id.* at 91. In the first three days of trading the IPOs, the scheme generated several million dollars in excessive markups. *Id.*

deducted certain business expenses, such as commissions, telephone charges and underwriting expenses. *Id.* at 92, 94-95. The court explained that "markups are a function of the way a securities firm does business, and thus have corresponding costs and expenses related to them." *Id.* at 95. Given that the customers would have had to factor these expenses into their returns regardless of the defendants' scheme, the court concluded that a reduction was appropriate "to reflect a fair setoff for *necessary* business expenses." *Id.* at 92 (emphasis added); *see also Litton Indus., Inc. v. Lehman Bros.*, 734 F. Supp 1071, 1077 (S.D.N.Y. 1990) (allowing deductions for various transaction costs, including brokerage commissions paid to third party brokers as part of an agreement for services customarily rendered in connection with the transactions at issue).

[5] Applying *Thomas James*' analysis does not help the defendants here. Their entire business enterprise and related expenses were not legitimate at all, and no aspect of the defendants' conduct can be fairly characterized as a "function of the way a securities firm does business." 738 F. Supp. at 95; *see also Cross Fin. Servs.*, 908 F. Supp. at 732 (explaining that a defendant's "receipt of investor monies for an alleged purpose that was never disclosed to the investors" demonstrates in part "the absence of any legitimate call on the funds"). Unlike the brokerage firm in *Thomas James*, Wallenbrock and Citadel existed simply to obtain investors' money under false pretenses, money the defendants spent at their sole discretion, unrelated to the investors' expectations of the purposes, risks and rewards of entrusting the defendants with their investment dollars.[12] In short, the defendants here seek

---

[12]*Thomas James* itself recognized that "securities law violations may exist in which disgorgement is properly ordered in the amount of the total gross profits." 738 F. Supp. at 95 (citing *SEC v. R.J. Allen and Associates, Inc.*, 386 F. Supp. 866 (S.D. Fla. 1974), in which the court ordered disgorgement of *all* proceeds received in a fraudulent scheme aimed at deceiving and defrauding investors). For example, the court noted that when a securities law violator earns profits "in furtherance of arguably more egregious forms of securities fraud," such as insider trading, the wrongdoer may not insulate those profits from disgorgement. *Id.*

an offset for *entirely illegitimate* expenses incurred to perpetuate an *entirely fraudulent* operation.

**[6]** Neither the deterrent purpose of disgorgement nor the goal of depriving a wrongdoer of unjust enrichment would be served were we to allow these defendants — who defrauded investors of $253.2 million — to "escape disgorgement by asserting that expenses associated with this fraud were legitimate." *SEC. v. Kenton Capital, Ltd.*, 69 F.Supp. 2d 1, 16 (D.D.C. 1998); *see also SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1087 (D.N.J. 1996) (stating that the "overwhelming weight of authority holds that securities law violators may not offset their disgorgement liability with business expenses"). The district court did not abuse its discretion in refusing to deduct $36.6 million in Wallenbrock and Citadel business and operating expenses from the disgorgement amount. *See also SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985) (holding that the court possesses the equitable power to grant disgorgement of "a sum of money equal to all the illegal payments [ ] received").

### 2. *Loan to Citadel*

**[7]** The defendants contend that Wallenbrock loaned $131.0 million to Citadel as a capital investment. However, the forensic CPA's comprehensive accounting of the defendants' scheme reveals that Wallenbrock loaned only $99.8 million to Citadel, an amount Wallenbrock paid directly to start-up businesses on Citadel's behalf. The district court properly ordered this amount disgorgeable, because it was a subsequent investment of the illegally obtained investor funds.[13] *See, e.g.*, *Thomas James*, 738 F. Supp. at 95 ("[A] securities

---

[13]The defendants' records indicate that Citadel was obligated to repay Wallenbrock only $71.2 million of the $99.8 million loaned. For disgorgement purposes, however, we construe the entire $99.8 million as a subsequent investment of the illegally obtained funds, regardless of its loan status.

law violator [may not] avoid or diminish his responsibility to return his ill-gotten gains by establishing that he is no longer in possession of such funds due to subsequent, unsuccessful investments or other forms of discretionary spending.").

To challenge this finding, the defendants rely on *Hateley v. SEC*, 8 F.3d 653 (9th Cir. 1993), to suggest that the $99.8 million paid to start-up companies should not be disgorged because the defendants dissipated and did not retain these funds. *Hateley* provides no support for this argument. The three petitioners in *Hateley* were a broker-dealer securities firm that was a registered member of the National Association of Securities Dealers, Inc. ("NASD") and two of its officers. *Id.* at 654. They had entered into a "finder's fee agreement" with a third party (who — in violation of NASD rules — was not a registered representative of the firm) giving him 90 percent of the commissions generated by all securities transactions he solicited on behalf of the firm. *Id.* These commissions totaled roughly $55,000, of which the petitioners retained only $5,062.50, according to the agreement's terms. *Id.* The NASD, affirmed by the SEC, held the three petitioners jointly and severally responsible for disgorging the entire $55,000 in commissions, although also holding the third party liable for disgorging his $50,000 share. *Id.* at 655-56.

We upheld the joint and several aspect of the disgorgement award because the petitioners "acted collectively" to enter into the "improper arrangement" with the unregistered third party. *Id.* at 656. But we held that the petitioners' "unjust enrichment" was limited to the $5,062.50 in fees they actually retained *under the terms of the preexisting illicit agreement.* Moreover, to hold them also liable for the third party's $50,000 share would have been duplicative of his disgorgement liability and over 10 times their own illicit fee. *Id.*

**[8]** Here, there was no preexisting agreement limiting the defendants to only a share of the ill-gotten gain or requiring them to pay a portion of the proceeds to third parties. The

defendants funneled all of the proceeds from the scheme to the Wallenbrock checking account, which Osaki then distributed to himself, to Wallenbrock, to Citadel or to start-up investment companies. The manner in which Osaki chose to spend the illegally obtained funds has no relevance to the disgorgement calculation because, as we have explained, the defendants had the full benefit of the entire $253.2 million fraudulently raised from investors. *Cf. SEC v. Benson*, 657 F. Supp. 1122, 1134 (S.D.N.Y. 1987) (stating that the "manner in which [the defendant] chose to spend his misappropriations is irrelevant" to the disgorgement calculation). As with the defendants' other uses of their ill-gotten gains, using the investors' $99.8 million to invest in start-up companies (rather than purchase accounts receivable) was part of the defendants' unjust enrichment. The district court did not abuse its discretion when it included this amount as part of the disgorgeable gain.

### 3. *Unrelated Income*

Finally, we see no merit to the defendants' assertion that $23 million of the funds raised came from its business operations unrelated to income from investors. The forensic CPA's accounting (which is based on the defendants' own records) shows that investor funds comprised the entire $253.2 million, including $229.2 million received from individuals and companies and $24.0 million from investors' IRA and other retirement accounts. The defendants have not offered evidence to challenge the CPA's accounting. Thus, the district court did not abuse its discretion when it included this amount as ill-gotten gain.

### B. Joint and Several Liability

[9] The district court properly held Wallenbrock, Osaki and Citadel jointly and severally liable for the disgorgement of their fraudulently obtained investor funds. "[W]here two or more individuals or entities collaborate or have a close rela-

tionship in engaging in the violations of the securities laws, they [may be] held jointly and severally liable for the disgorgement of illegally obtained proceeds." *See First Pac. Bancorp*, 142 F.3d at 1191; *see also Hateley*, 8 F.3d at 656. Based on the undisputed allegations in the complaint and the forensic CPA's accounting, the district court found that Osaki, Wallenbrock and Citadel raised the almost $253.2 million from investors by fraudulently offering high return investments in accounts receivable financing.[14] Rather than invest the money as they represented, the defendants used all of the investors' funds to operate their pyramid scheme and invest in speculative business ventures, all to the defendants' benefit. Given these undisputed allegations, the district court did not abuse its discretion in concluding that Wallenbrock, Osaki and Citadel evinced the requisite close relationship and jointly benefitted from the illegal scheme to be found jointly and severally liable.[15]

## C.   Disgorgement against Ichinotsubo

[10] The district court did not abuse its discretion in ordering disgorgement of $409,798 against Ichinotsubo despite his loss on the $1.2 million he invested in the pyramid scheme. As we noted in *First Pacific Bancorp*, "the fact that [a defendant's] scheme ultimately failed and he lost $1,000,000 of his own funds [does not] release him from his [disgorgement] obligations." 142 F.3d at 1192 n.6. The district court found that Ichinotsubo made false representations to investors and

---

[14]Citadel also acted as an unregistered securities broker-dealer in connection with the scheme.

[15]The defendants' argument that joint and several liability cannot be imposed on Citadel, a nominal defendant, is without merit. Even if Citadel is a nominal defendant, the district court has the authority to require disgorgement of ill-gotten gains from such defendants. *See SEC v. Colello*, 139 F.3d 674, 676-77 (9th Cir. 1998) (holding that the SEC may sue a nominal defendant "to effect full relief in the marshaling of assets that are the fruit of the underlying fraud").

that he was unjustly enriched by $409,798 as a result of his conduct.[16]

## IV.   Conclusion

The entire $253.2 million the defendants received was an "ill-gotten gain" that "unjustly enriched" a "wrongdoer." *First Pac. Bancorp*, 142 F.3d at 1191-93. Because the district court did not abuse its discretion in assessing the amount of disgorgement against the defendants or in imposing joint and several liability against Wallenbrock, Osaki and Citadel, the judgment of the district court is **AFFIRMED.**

---

[16]This amount includes $232,704 in payroll payments, $36,503 in unpaid loans from Citadel, a $50,000 unpaid loan to Ichinotsubo's company, a $60,591 credit card payment made by Osaki with investor funds on Ichinotsubo's behalf, and a $30,000 direct payment of investor funds from Osaki to Ichinotsubo.