SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

CROSS FINANCIAL SERVICES,
INC., et al., Defendants.

No. CV 94–4228 RAP (Ex).

United States District Court,
C.D. California.

Sept. 5, 1995.

Elaine M. Cacheris, Sandra J. Harris, Robert D. Laframenta, Karen Matteson, Kathleen Herkenhoff, for Plaintiff.

Richard C. Chier, Mark T. Mauerman, Arthur H. Barens, Brian O'Neill, Edward Klein, Charles E. Slyngstad, Alfred V. Greco, Rigo-

berto Obregon, M. Nelson Segel, for Defendants.

## ORDER GRANTING SECURITIES AND EXCHANGE COMMISSION'S MOTIONS FOR SUMMARY JUDGMENT AGAINST DEFENDANTS FOX, FRANKLIN, CROSS, SIEMENS, AND RELIEF DEFENDANT COLELLO AND DENYING COLELLO'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

PAEZ, District Judge.

## I

### INTRODUCTION

■ This case illustrates the adage "if it sounds too good to be true, it probably is." From March 1993 through June 1994, defendants devised and participated in a scheme to raise money from investors by representing that they would use investors' funds to engage in factoring accounts receivable.[1] Defendants represented that investors would receive returns at an annual rate between fifteen and twenty percent and that their investments were low risk. Defendants never, however, factored even one account. Although defendant Cross Financial Services later changed its business focus from factoring to purchasing letters of credit, defendants continued to promise the same high rates of return and low risk and used the same means to solicit and obtain investor funds.

Defendants raised more than $21 million from over 700 investors nationwide. Defendants never complied with the securities registration requirements; misappropriated investor funds for their own purposes and without ever disclosing their duplicity to those investors; and operated a Ponzi scheme. CFS never loaned investor funds to entities secured by accounts receivable (the stated business purpose of CFS) and paid nearly $4 million to defendant Colello to buy "false" or uncollectible letters of credit.

After conducting an investigation, the Securities and Exchange Commission ("SEC" or "Commission") filed its Complaint for Temporary Restraining Order, Preliminary and Permanent Injunctions, Appointment of a Receiver, and Other Equitable and Legal Relief ("the Complaint") against Cross Financial Services, Inc. ("CFS"), Owen R. Fox, Carroll E. Siemens, Bruce Franklin, Michael J. Colello, and Douglas S. Cross on June 23, 1994. That same day, the SEC applied *ex parte* for a "Temporary Restraining Order, Temporary Orders: (1) Prohibiting the Transfer of Assets and Destruction of Documents; (2) Freezing Assets; (3) Appointing a Receiver; and (4) For an Accounting, Order to Show Cause Why a Preliminary Injunction Should Not be Granted and the Temporary Orders Should Not Be Continued, and Request for Waiver of Notice Pursuant to Local Rule 7.18.2" ("the *Ex Parte* TRO Application"). The Commission submitted three volumes of exhibits supporting its application.

Judge Hatter entered an order granting the SEC's *Ex Parte* TRO Application on June 23, 1994, appointing Richard G. Shaffer the temporary receiver. The Court then issued a preliminary injunction with respect to two of the defendants, CFS and Franklin, on July 5, 1994. The Court also appointed a permanent receiver over Cross Financial Services, Inc. that same date.

The case was then transferred to this Court, and on July 26, 1994, the Court issued a preliminary injunction enjoining Fox, Siemens, and Cross, but not Colello. On July 27, 1994, the Court entered a separate order denying the SEC's request for a preliminary injunction against Colello and other relief and dissolving the June 23, 1994 temporary restraining order against him.

The SEC's First Amended Complaint was filed on May 8, 1995. The Commission changed defendant Colello's status to a "nominal" or "relief" defendant and deleted its request for damages.

The SEC has moved for summary judgment against defendants in two stages. First, as against Fox, Franklin, and Cross,

---

1. "Factoring" is the "sale of accounts receivable of a firm to a factor at a discounted price. The purchase of accounts receivable from a business by a factor who thereby assumes the risk of loss in return from some agreed discount." *Black's Law Dictionary* (6th ed. 1994) (citation omitted).

the SEC contends that no genuine issue of material fact exists regarding defendants' offer and sale of unregistered securities to the public and their untrue statements and omissions of material fact in the course of offering and selling the securities (that is, the promissory notes CFS had its investors sign). The SEC also sought summary judgment against relief defendant Colello in the same motion, requesting that the Court order him to disgorge funds he received to purchase the uncollectible letters of credit ("LCs").

Only Colello opposed the first motion. He also moved to dismiss or for summary judgment on the grounds that the court lacked subject matter jurisdiction and that the SEC failed to state a claim against him as a nominal defendant.[2]

The SEC subsequently moved for summary judgment against defendant Siemens. Siemens filed no points and authorities in opposition to the motion, although he submitted two declarations, certain documents, and a Statement of Genuine Issues. Rule 7.6 of the Local Rules of the Central District of California requires a party opposing a motion to file and serve the evidence it relies on and "a brief but complete memorandum which shall contain a statement of all the reasons in opposition thereto and the points and authorities upon which the opposing party will rely[.]" Failure to do so "may be deemed by

the Court consent to the granting ... of the motion[.]" L.R. 7.9. Although the Court could find that Siemens failed to oppose the SEC's motion, the Court considered Siemens' "evidence" and declarations on the merits, as discussed below.

For the reasons set forth in this order, the SEC's motions for summary judgment against defendants Fox, Franklin, Cross, Siemens, and nominal defendant Colello are granted and Colello's motion to dismiss or for summary judgment is denied. This order constitutes the Court's reasons for finding that there are no material triable issues of fact and that plaintiff is entitled to judgment as a matter of law. Fed.R.Civ.P. 52(c).

## II

### FACTUAL BACKGROUND [3]

Defendant Carroll E. Siemens ("Siemens") has worked as a consultant since 1985, advising ten to fifteen companies where to go to incorporate and to obtain loans. He does business as Siemens, Inc. and Siemens Consultants. Siemens is the president, director, and sole shareholder of Siemens, Inc., which has never had a physical office. Siemens, Inc. has had bank accounts located at Bank One in Phoenix, Arizona and First Interstate Bank in Las Vegas, Nevada. He signed the

---

2. Colello requested that the Court permit him to cross-examine declarants Kathleen Herkenhoff (SEC counsel), Alvin Buschman (investor), Arian Colachis (former SEC counsel), and Richard Shaffer (receiver), pursuant to Local Rule 7.5.4. Local Rule 7.5.4 applies when an *issue of fact* is to be *determined*. A motion for summary judgment, of course, discerns the existence of factual disputes, but is not a mechanism to resolve them. Colello's request was denied at the hearing on the motion.

3. Colello was the only one of the defendants involved in the SEC's first motion to "contest" any of the facts set forth in the Commission's statement of uncontroverted facts. In his Statement of Genuine Issues in Opposition to Motion of the Securities and Exchange [sic] for Summary Judgment, Colello merely listed 41 "material facts," none of which referred to any evidence. Although Colello's lawyer submitted a declaration to which he attached exhibits, he was not a percipient witness and made no effort to correlate the purported evidence to any of the SEC's uncontroverted facts. And, it must be noted that

Colello asserted his privilege against self-incrimination. As another court in this district has stated so well: "[i]n those instances in which a party asserts the Fifth Amendment across-the-board in civil litigation to prevent an opponent from obtaining any discovery at all of evidence of the facts at issue and of the position of the party invoking the privilege on those facts, the injustice of allowing that party to put on evidence at a hearing or trial on the same facts is especially manifest." *SEC v. Interlink Data Network of Los Angeles, Inc.*, 1993 WL 603274 (C.D.Cal.1993), p. 20 n. 97, *citing Anglada v. Sprague*, 822 F.2d 1035, 1037 (11th Cir.1987).

As for defendant Siemens, he cites to no evidence in his Statement of Genuine Issues of Material Fact in Support of His Opposition to Plaintiff's Motion for Summary Judgment ("Siemens Gen.Iss."). He does offer two declarations. The one that responds to the SEC's Uncontroverted Facts does not refer to any evidence; the other one is not tied to any of the SEC's points but appears instead to quarrel with selected items of evidence.

signature card for the Siemens, Inc. account at Bank One.

Siemens used the name "IGOC" for his Bank One account in which he deposited consulting fees. He signed the signature card for the IGOC account at Bank One's corporate predecessor, Valley National Bank. He also signed a signature card on the Bank One account for Marquis Management Group, Inc. ("Marquis"), which listed him as president. Siemens' wife signed the signature card as a director of Marquis. Siemens signed checks on the Marquis account at Bank One.

Siemens previously consulted for American Contractors Funding ("ACF"), which factored U.S. government accounts receivable. Siemens and defendant Bruce Franklin found investors for ACF.

Franklin introduced Siemens to defendant Douglas S. Cross in 1993. Siemens picked up Cross at the Phoenix airport and drove him to ACF's office. Siemens brought Cross to ACF as an investor.

Cross consulted Siemens in early 1993 for advice about setting up as a Nevada corporation the entity that became defendant Cross Financial Services. Cross told Siemens that he wanted to go into government contracting, and Siemens understood that Cross was setting up CFS as a factoring company. Cross and his wife, Kathleen Cross, met with Siemens in February 1993 to discuss CFS's factoring operations and how to raise money from individuals. Siemens also met with Franklin and Cross to discuss where to incorporate CFS and the interest rates CFS would pay its investors. Siemens gave Cross the name of an incorporator, told him where to go to the library to research, and advised him that he needed an attorney. Siemens accompanied Cross to Bank One to set up the CFS bank account. Siemens also accompanied Cross and spent four hours with him while Cross explained to the Securities Division of the Secretary of State's office in Nevada what CFS was going to do. Cross later contacted Siemens to determine whether he had obtained CFS's license from the City of Las Vegas to do business in the State of Nevada.

Cross Financial Services was incorporated in Nevada in March 1993 and had an office in Las Vegas. Siemens physically occupied the CFS Las Vegas office, received telephone calls on the CFS line, and deposited checks to the CFS Bank One account. Cross testified that Siemens "was largely responsible for starting me up in business[;] . . . he indicated that he would help me raise the money and place the money[.]" Cross also testified that Siemens "put Bruce [Franklin] on as chief financial officer and would work with other consultants who would assist in raising money from private lenders."

Douglas S. Cross, age 43, was CFS's President, treasurer, secretary, and sole shareholder from March through November 1993. As President, Cross wrote all checks and made all the wire transfers for CFS, oversaw its bank account, kept track of the investors to be sure they were paid, sent promissory notes to the investors for their loans, and paid the sales consultants. He also sent welcome letters to investors and made oral representations to investors about CFS.

Bruce Franklin, 32, was CFS's Chief Financial Officer from March through December 1, 1993. He worked at the Las Vegas office and read all incoming correspondence. Franklin helped market the CFS Promissory Notes, acted as a sales consultant, and worked with (helped train) other sales consultants for CFS until at least December 1993. He apprised Siemens of how Cross was "running the company." Siemens told Franklin that he thought they could trust Cross. Franklin also "consulted" for CFS after December 1, 1993 by arranging transactions between investors and CFS, for which he was to be paid $10,000 per month.

Carroll E. Siemens's company, Siemens, Inc., received money from CFS for providing consulting services, including assisting CFS in obtaining an uncollectible $4 million letter of credit and purportedly for purchasing two $1 million letters of credit. Siemens received the money supposedly for the purchase of letters of credit and then transferred the money to Switzerland. No written agreements between Siemens and CFS exist regarding Siemens' consulting services or fees.

Michael J. Colello helped CFS acquire letters of credit and received substantial fees from CFS through Siemens. Monies that Siemens transferred to Colello were purportedly to pay Colello's fees for locating "applicants" for the letters of credit. Colello has refused to answer any of the SEC's questions during the investigation phase or this litigation, asserting his Fifth Amendment privilege against self-incrimination.

On December 1, 1993, Cross sold CFS to Owen R. Fox, 49, who became CFS's owner, President and CEO and was its sole shareholder until at least July 5, 1994. Siemens recommended a lawyer to Cross to facilitate the sale of CFS to Owen Fox. Siemens arranged and negotiated the sale of CFS to Fox and knew that CFS was sold to Fox (a CFS sales consultant) because Fox had experience in buying companies with regulatory problems.

As President, Fox was responsible for investing CFS's money and determining the rate of return to CFS's investors, for the payment of interest to CFS's investors, and for CFS's bank accounts. He also met with potential sales consultants to instruct them on how to offer CFS's program. Fox raised money for CFS from private investors before he acquired the company.

CFS used "sales consultants" to obtain investors. CFS held a training meeting for its sales consultants in October 1993 in Las Vegas. Siemens attended the entire meeting. Potential investors also attended the meeting, which included presentations by Cross and Franklin on the CFS factoring program. At one point, a person in the audience apparently asked about risk to an investor's funds before the letter of credit issued, and Siemens told the audience that he "didn't need to steal any investor's funds."

The sales consultants sent a CFS brochure, which Cross and Franklin had drafted, entitled "Government Accounts Receivable Financing Investment Program" to investors. The brochure stated that, among other things, CFS "provides short-term financing to companies awarded government contracts" and that CFS "is in the business of providing financing to manufacturers, suppliers, and distributors awarded Government contracts." The brochure referred to lenders to CFS as investors. It also stated that once an investor "signs the Lender Agreement and Promissory Note and deposits the funds in the lockbox account ... CFS will [immediately thereafter] ... begin the invoice financing process," that is, "factoring." [4]

That brochure also stated that investor funds were deposited directly into a bank "lock-box (escrow) account," that funds on deposit in CFS's account were "used for invoice financing only," that CFS would finance only "inspected invoices," that an inspected invoice was one that "a Government officer has signed and stamped, accepting receipt of the shipment" and that CFS financed only invoices that were "an irrevocable debenture of the government, due and payable [within] thirty (30) days."

The brochure included an unexecuted lender agreement which specified the rates of return, ranging from 15 to 20 percent. The brochure did not mention letters of credit, bank guarantees, or payments to CFS agents.

CFS's account at Bank One was not an escrow account, as represented. CFS engaged in no accounts receivable factoring, government or otherwise, from March 1993 through November 1993, contrary to the representations.

Cross and Franklin revised the brochure. The revision did refer to letters of credit, but stated only that "[i]f this loan is secured by a Letter of Credit caused by the Maker [CFS] to be opened and issued to the benefit of the Holder [the investor] for the full amount of the principal of this loan, the Maker is released from any further obligation to repay the principal of this Note." The new brochure did not refer to bank guarantees. It did state, though, that there were "no upfront or back-end charges of any nature,

---

4. Siemens also contacted a Richard Usher of Edward Mitchell and Co. (also owner of RZ Properties) regarding a fidelity bond for CFS. He told Usher about the CFS factoring business. The bond was to be used to solicit investors, despite the fact that Usher told Siemens that the bond did not insure CFS investors against losses. A $300,000 bond issued.

including sales fees. *All of your funds go to work immediately.*" (Italics in original). The brochure again referred to CFS's lockbox account, representing that "we are having periodic reviews ... done by an independent organization." This representation also was false.

The new lender agreement included with the revised brochure stated that CFS may use investor funds to factor for a "suitable commercial contract" or to pay for "reasonable and necessary expenses of [CFS]," without explaining either term.

Fox used information from a one-page document regarding CFS's Government Accounts Receivable Financing Investment Program when communicating with potential investors. Among other things, that document stated that "[c]hecks [are] paid monthly by [the] Department of the Treasury to [CFS's] Bank Lockbox." The U.S. Treasury never made payment into CFS's account.

When Fox acquired CFS, he revised the investor agreement and promissory note. As in the previous revision, letters of credit were referred to only with respect to a release of CFS from further payment obligations. Fox's version of the documents also did not mention bank guarantees. The new promissory note stated that "[t]his is a commercial loan and the proceeds hereof will be used for a business purpose and not for family, household, or other purpose." The revised lender agreement stated that investor funds would remain on deposit in CFS's account "until an Invoice has been signed, accepted, and a projected payment date is established by the Government, a suitable commercial contract, an established bank guarantee, or to pay for reasonable and necessary expenses of the corporation." That agreement also stated that CFS would protect investor funds against loss with Accounts Receivable Insolvency Insurance on financed invoices where appropriate or by Bank Guarantees.[5] Not-

withstanding Fox's revisions, CFS investors continued to receive the earlier versions of the note and lender agreement even after December 1, 1993.

CFS never used investor funds for commercial or government accounts receivable factoring.

From March 1993 through November 1993, CFS raised in excess of $9.4 million from its investors and returned approximately $763,176 to the investors. From December 1993 through June 1994, CFS raised in excess of $13.2 million from investors, paying only $5.5 million to the investors.

Other entities that received CFS investor funds included Marquis Management Group, Inc. ("Marquis"), of which Cross was president at one point; Siemens' consulting company, Siemens, Inc.; Bruce Franklin's Franklin & Associates; Fox's real estate and business management firm, Fox Management, Inc.; Fox's company O.T. Fox & Associates, Inc.; and Fleetwood Murdock, a marketing company connected with Bob Adams, a CFS sales consultant.

Cross caused the purchase of a $4 million letter of credit, purportedly for the benefit of CFS, which is uncollectible. At Cross' request, Siemens assisted CFS in obtaining the LC. Bank Ukraina issued the LC and listed a J & A International Group in *Kiev* as the applicant. The LC further required that in order to negotiate payments, CFS had to produce certain documents by January 20, 1995. The documents were: (1) CFS' certificate stating that it certified that the amount drawn (i.e., the $4 million) represented the unpaid balance due *to CFS* for *machinery* on a turn-key basis, technology and transfer of operational know-how from Montrose Limited; and (2) an amendment by tested telex or "swift" from Bank Ukraina to First Interstate Bank of Nevada, N.A. confirming that Bank Ukraina received written approval of

---

5. Siemens asked Timothy Maison of American Credit Indemnity ("ACI"), an insurance company that provides accounts receivable insolvency insurance, to let him place Maison's and ACI's names and telephone numbers in CFS' offering brochure. Siemens explained to Maison that he was going to set up or otherwise be involved in CFS, a factoring company. Siemens gave Mai-

son a copy of the first offering brochure. Potential investors called Maison as a result of his name being listed in the brochure. Maison later asked that their names be removed from the brochure over concerns that potential CFS investors were misinformed that accounts receivable insolvency insurance was available on *government* accounts receivable.

payment from the applicant. (Emphasis added.)

Siemens has never heard of the applicant (J & A) or the entity "Montrose Limited." The Receiver has been unable to collect on the LC. CFS investors did not know that CFS was using their funds to purchase bank guarantees or LCs and would not have invested in CFS had they known. Siemens does not deny that he knew the LC purchases via Siemens, Inc. were unrelated to CFS's business, but argues he was "merely a fiduciary" and that the LCs were *"never purchased through* Siemens, Inc."

While Cross still owned CFS, Alvin Buschman invested the sum of $1.35 million. Buschman called Siemens in early August 1993 after he was provided with the telephone number before deciding to invest in CFS. Siemens told Buschman that Cross had invested some of Siemens' money (Buschman understood Siemens to mean that he had invested in CFS), that he believed Cross to be honorable, and that he would be willing to invest even more money with Cross. Buschman decided that he wanted a letter of credit in *addition* to the CFS promissory notes, to secure his investment. Before he invested in CFS, Buschman received a letter from Siemens on Siemens, Inc. letterhead, dated August 12, 1993, instructing Buschman to transfer money to the Siemens, Inc. bank account to obtain the letter of credit and to execute his CFS promissory note. The letter stated that one of three banks (Barclay's, Standard Chartered, or National Westminster) would issue the letter of credit. Siemens claims the letter is a forgery.

Siemens does not deny that on or about August 23, 1993, Buschman wired $1,350,000 to Siemens, Inc. for the LC purchase. The funds were sent to Switzerland. Siemens never received any documentation on the processing of a letter of credit for Buschman. Agroindustrial Bank Ukraina, not any of the stated banks, issued the letter of credit. The letter of credit also referred to certain entities (J & A International Corp. and Chapel Limited) that Buschman had not heard of and that were not mentioned in the letter Buschman had received from Siemens, Inc.

Buschman's letter of credit contains certain document presentation requirements that were never disclosed to him and that were impossible for him to satisfy. Had he known that a Ukrainian bank would be the issuing institution, he would not have agreed to the letter of credit as security. In addition, Buschman understood from the brochure (and was never told otherwise by Siemens or anyone else) that his $1.35 million investment would not be used for anything but government accounts receivable factoring. No one told Buschman that his *investment* funds would be used to purchase the letter of credit or would be transferred to Europe. He would not have invested in CFS had he known that his investment would not be used for the stated purpose.

Buschman's letter of credit was due and payable on August 25, 1994. He has been unable to obtain payment.[6] Furthermore, of Buschman's $1.35 million, transferred to the Siemens, Inc. account, $540,000 was transferred to CFS (the Bank One account) for "bringing in" Buschman. According to the Receiver, Siemens received $108,000 of the Buschman funds. Rec.Rep., p. 26.

Between February 16, 1993 and September 7, 1993, the only sources of deposits to the Siemens, Inc. bank account other than three $100 deposits were from Buschman and CFS. During this time, numerous transfers were made to U.S. and Swiss accounts bearing Colello's name. Colello was asked during investigative testimony and his deposition about each one, including whether he knew the source of the funds and whether these were in fact his accounts. He asserted his Fifth Amendment privilege against self-incrimination in response to every question. The sum of the transfers was $2,980,598.00.

Siemens used CFS investor funds to make loans at high interest rates in several instances. For example, through IGOC, Siemens loaned U.S. Express, a trucking company owned by John Walsh, $200,000 on February 17, 1993 at 72% annual interest. He also

---

6. According to the Receiver's First Report, filed July 21, 1995, "J & A International" does not appear to exist, which "casts doubt on the genuineness of the letter." Rec.Rep., p. 23.

directed and assisted CFS in making loans to U.S. Express at annual interest rates of 60%. Siemens knew that U.S. Express would use the funds to meet its cash-flow needs. Siemens completed the promissory notes and initialled them, then later told Walsh that he and Franklin had purchased the obligations and that Walsh should make payments thereafter to Siemens, Inc. Siemens disputes immaterial aspects of the transactions with Walsh, but not the facts of the loans or the source of the funds.

Siemens had CFS loan $135,000 to Usher/RZ to purchase a piece of property, and had the authority to prevent CFS from doing so. He knew the purpose of the loan but did not review RZ's financial information or inspect the property. Siemens required Usher to pay him a $2,000 finder's fee as a condition of obtaining the loan and witnessed the execution of the promissory note between CFS and Usher/RZ. Siemens disputes his purported controlling role in the transaction.

CFS paid sales consultants commissions totalling $312,375.42 from March 1993 through November 1993, and $637,069.20 from December 1993 through June 1994, none of which were disclosed to investors. Fox also used investor funds to engage in futures spread trading on commodity futures exchanges. $1.1 million was transferred from CFS's bank account to an Edward Schroeder. Approximately $400,000.00 was used for futures trading for Fox's personal benefit. At the time this action was filed, Schroeder still had $700,000.00 in CFS investor monies, which he kept.

On December 2, 1993, $1.3 million was transferred from CFS's bank account to the Marquis bank account and $200,000 to the Siemens, Inc. account. Cross received the $1.3 million. He transferred $374,908.27 from CFS's bank account to the Marquis account and used these funds to return the principal and interest to four CFS investors, all relatives and friends of his, to whom CFS was paying higher interest rates than it paid other investors.

During his period of ownership, Fox transferred investor funds from CFS's account to the Franklin & Associates and Siemens, Inc. bank accounts, purportedly for the purchase of letters of credit. CFS investors were never told of this use of their funds, nor did Fox ever receive the LCs in question.

Fox was even more brazen. On February 22, 1994, he had $350,000 transferred from the CFS account to Cessna Financial to pay for a personal airplane. On March 29, 1994, $500,000 was transferred from CFS's account to Fox Management, Inc., a portion of which was used to purchase *two* boats for Fox. Investors were never informed of these misuses of their funds.

As part of the sale of CFS from Cross to Fox, a $25,000 loan from CFS to Cross's company Marquis (for Marquis's start-up costs) was forgiven.

None of the defendants disputed any of the amounts received and now owed. Defendant Fox received a total of $7,850,710.09. Of this sum, Fox is jointly and severally liable with defendant Cross for $72,043.10. Fox is also jointly and severally liable with Defendant Franklin for $2,035,590.33.

Defendant Cross received $8,650,118.38, of which he is jointly and severally liable with Fox for $72,043.10; of which he is jointly and severally liable with Franklin for $357,395.88; and of which he is jointly and severally liable with Siemens for $2,416,383.21.

Defendant Franklin received $357,395.88, and is jointly and severally liable with Cross for this amount.

Defendant Siemens received $6,594,077.09, and is jointly and severally liable with: (1) defendant Cross for $2,416,383.21; (2) defendants Franklin and Cross for $357,095.88; (3) defendant Fox for $707,743.00; and (4) defendants Fox and Franklin for $492,257.00.

Relief defendant Colello received $2,620,598.

## III

### DISCUSSION

#### A. *Standards*

The purpose of a Rule 12(b)(6) motion is to test the "legal sufficiency of the claim or claims stated in the complaint." Schwarzer, Tashima and Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial*

("*Fed.Civ.Proc.*"), § 9:187 (1994), *citing Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *De La Cruz v. Tormey*, 582 F.2d 45 (9th Cir.1978). The motion is disfavored; "dismissal is proper only in 'extraordinary' cases." *Fed.Civ.Proc.*, § 9:210, *citing United States v. Redwood City*, 640 F.2d 963 (9th Cir.1981).

■ In evaluating the motion, the Court looks only to the face of the complaint to determine whether there are defects. *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir.1991); *see also Fed.Civ.Proc.*, § 9:211. The complaint is construed in the light most favorable to the plaintiff. *Russell v. Landrieu*, 621 F.2d 1037, 1039 (9th Cir. 1980); *Fed.Civ.Proc.*, § 9:213. In addition, "the court must accept as true all material allegations in the complaint, as well as *reasonable inferences* to be drawn from them". *Fed.Civ.Proc.*, § 9:215 (emphasis in original), *citing NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986). In short, the "test is whether the facts, as alleged, support *any* valid claim entitling the plaintiff to relief," regardless of whether plaintiff erroneously used the wrong legal theory. *Fed.Civ. Proc.*, § 9:227 (emphasis in original); *Haddock v. Board of Dental Examiners of California*, 777 F.2d 462, 464 (9th Cir.1985).

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment "terminates the action without trial" and is a "judgment 'on the merits.'" Schwarzer, Tashima, and Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial* ("*Fed.Civ.Proc.*"), § 14:28 (1994). Not only is summary judgment not "disfavored," but it is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corporation v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

In a trilogy of 1986 cases, the Supreme Court clarified the standard for summary judgment. *See Celotex Corporation v. Catrett, supra; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Matsushita Electric Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. The Court determines a fact's materiality according to the governing substantive law; if the fact may affect the outcome it is material. *Id.* at 248, 106 S.Ct. at 2510. If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, its burden must be satisfied by affirmative admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553–54; *see also Fed.Civ.Proc.*, §§ 14:123–141.

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In assessing whether the non-moving party has raised a genuine issue, the Court must believe the nonmovant's and draw all justifiable inferences in his favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14, *citing Adickes v. S.H. Kress and Company*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient. *Id.* at 252, 106 S.Ct. at 2512. As the Court explained in *Matsushita:*

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as

a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

475 U.S. at 586–87, 106 S.Ct. at 1356.

## B. *Preliminary Matter: The Promissory Notes are Securities*

█ The promissory notes that defendants offered and sold are "securities" as either notes or investment contracts. The U.S. Supreme Court has explained that notes are *presumed* to be securities unless they fall into certain judicially created categories that plainly are not securities or bear a "family resemblance" to notes in those categories. *Reves v. Ernst & Young,* 494 U.S. 56, 64–68, 110 S.Ct. 945, 951–52, 108 L.Ed.2d 47 (1990). The Court identified four factors to be considered in deciding whether a particular note is a "security." These four elements are:

[1] the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the interest is likely to be a "security." ... [2] ... the "plan of distribution" of the instrument ... whether it is an instrument in which there is "common trading for speculation or investment," .... [3] ... the reasonable expectations of the investing public. ... [and] [4] ... whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

*Id.* In applying the four-part test to the facts in *Reves,* moreover, the Court elaborated on what were already quite straightforward elements.

In *Reves,* the purchasers bought notes "in order to earn a profit in the form of interest," and the seller (Co-Op) sold the notes to raise capital for the business. The motivation, the Court explained, was "most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction." *Id.* at 68, 110 S.Ct. at 952.

Regarding the second element, the "plan of distribution," the Court observed that the Co–Op's notes were "offered and sold to a broad segment of the public, and *that is all we have held to be necessary* to establish the requisite 'common trading' in an instrument." *Id.* at 68, 110 S.Ct. at 953 (emphasis added). It did not matter that the notes were not sold on an exchange. *Id.*

To assess the third element—the public's "reasonable perceptions"—the Court considered that the note itself was called an "investment". Where nothing suggested an alternate characterization, "it would be reasonable for a prospective purchaser to take the Co–Op at its word." *Id.* at 69, 110 S.Ct. at 953.

Finally, where the notes were uncollateralized and uninsured, the Court determined that *no risk-reducing factor existed to support exempting the notes from securities regulation.* *Id.*

█ Investment contracts are also "securities" within the scope of the Securities Acts. Indeed, "investment contracts" are: (1) investments of money; (2) in a common enterprise; (3) with profits derived from others' efforts. *See SEC v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1943). In *SEC v. R.G. Reynolds Enterprises, Inc.,* 952 F.2d 1125 (9th Cir.1991), the court explained that the SEC could establish the "common enterprise" prong of *Howey* by showing either "vertical commonality" ("an enterprise common to an investor and the seller, promoter, or some third party") or "horizontal commonality" ("an enterprise common to a group of investors"). 952 F.2d at 1130. The Commission could satisfy the third element where the investors were largely dependent on the sellers' or someone else's efforts. *Id.* at 1135.

█ There is no dispute that the CFS promissory notes, under the *Reves* test, are the type of notes that constitute "securities." The investors' motivations (demonstrated by a sampling of investors whose declarations were submitted as exhibits) were simply to make a substantial profit, earning 10–24% annual returns on their investments. CFS's "plan of distribution" was a network of sales

consultants, newspaper advertisements, and radio broadcasts, which was successful enough to entice 700 investors to invest over $21 million within about fourteen months. CFS's representations, particularly in their brochure, stressing the security and attractiveness of the *investment,* satisfied the third element. Finally, no other regulatory scheme operated to protect the CFS investors, nor did CFS do anything to reduce the risk to its investors. Indeed, the principals' misuse and misappropriation of investor funds greatly increased the investors' risk. In short, as notes, the CFS promissory notes satisfy each of the four prongs of *Reves* so as to constitute "securities."

■ Even as "investment contracts," moreover, the CFS promissory notes were "securities." The note-holders unquestionably invested their money with CFS. Second, their funds were pooled, purportedly to enable CFS either to make loans to companies with government or commercial accounts receivable or to buy letters of credit. Third, the investors were dependent on CFS to succeed or fail and had no way to control or even influence CFS's decisions regarding its investments. Under the *Howey* three-prong test, then, the CFS notes also qualify as "securities" because they may be characterized as "investment contracts."

## C. *SEC's Motion Against Fox, Franklin, and Cross*

Defendants Fox, Franklin, and Cross do not deny that they violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and e(c), as they either directly sold, or were necessary participants in, the offer and sale of CFS's unregistered promissory notes, and used the means and instrumentalities of interstate commerce in such offers and sales. *See SEC v. Rogers,* 790 F.2d 1450, 1456 (9th Cir.1986); *Anderson v. Aurotek,* 774 F.2d 927, 929 (9th Cir.1985); *SEC v. Murphy,* 626 F.2d 633, 649–50 (9th Cir.1980).

Defendants Fox, Franklin, and Cross also do not deny that they violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities in the form of notes or investment

contracts, by the use of means or instruments of transportation or communication in interstate commerce or of the mails: (1) with scienter, employed devices, schemes or artifices to defraud; (2) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities. And defendants concede that they similarly violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5.

The SEC has further established without dispute that defendants Cross, Franklin, and Fox all acted with the degree of recklessness that, in the Ninth Circuit, will evidence scienter. *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568–69 (9th Cir.1990) (en banc), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). That is, the Ninth Circuit adopted the Seventh Circuit's definition of recklessness, as follows:

> [R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger or misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

914 F.2d at 1569 (*quoting Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977) (additional citations omitted).

The SEC has demonstrated that defendants solicited investors for a particular purpose, knowing that purpose to be dubious or outright nonexistent, particularly as the enterprise developed. The SEC has · also shown that defendants knowingly paid investor funds (in the case of Cross and Fox) to themselves or authorized and/or enabled payments to be paid to others, including Colello,

Siemens, and the sales consultants, none of which payments were ever disclosed to the investors. Fox, Franklin, and Cross have not recognized the wrongful nature of their conduct or offered assurances that they will not violate the securities laws in the future. Their conduct, moreover, was egregious. Without an injunction, it is likely that these defendants would violate the securities laws in the future. The three defendants have not opposed the SEC's motion, and the Commission is entitled to judgment against Fox, Franklin, and Cross as a matter of law in the form and for the amounts requested.

### D. *Colello's Motion to Dismiss or for Summary Judgment*

■ Colello first argues that the SEC cannot establish this Court's subject matter jurisdiction because the relevant statutes tie jurisdiction to violations of the Acts, and the SEC did not allege that Colello had violated the securities laws.

Two recent cases have expressly found subject matter jurisdiction as against non-violators. In *SEC v. Cherif*, 933 F.2d 403 (7th Cir.1991) (en banc), the court explained that "the non-interested status of the nominal defendant [meant] there is no claim against him and it is unnecessary to obtain subject matter jurisdiction over him once jurisdiction over the defendant is established." *Id.*, p. 414. The District Court in New Jersey relied on *Cherif* and also found a basis for jurisdiction in the statutes as interpreted to provide for equitable remedies such as disgorgement and constructive trust. *SEC v. Antar*, 831 F.Supp. 380, 398–401 (D.N.J.1993). Colello effectively concedes the existence of jurisdiction in his reply, moreover. The argument deserves no further consideration.

As for whether the SEC can state or prove a claim against Colello as a nominal or relief defendant, Colello contends that the factors set forth in *Cherif* do not apply here, that the evidence contradicts the SEC's characterization of Colello as a nominal defendant, and that disgorgement is not available against a nominal defendant. The SEC argues that it alleged the *Cherif* factors adequately to withstand dismissal. The SEC further contends that Colello has not established that the prof-

its defendants obtained were acquired legally or that he has a legitimate claim to the funds. Finally, the SEC maintains that disgorgement is a remedy available against a non-violator. The Court agrees.

In *SEC v. Cherif*, the SEC sued defendant Cherif for violations of the antifraud provisions of the federal securities laws. The SEC also named Cherif's cousin, Khaled Sanchou, as a nominal defendant, alleging that Cherif had "used Sanchou's accounts to facilitate his illegal trades and that the profits from Cherif's trading remained in Sanchou's accounts." 933 F.2d at 405. The "simple, cunning scheme" that Cherif devised involved his continued trading in stocks using his former employer's resources. That is, after his position at First National Bank of Chicago was eliminated, he forged a memo that allowed him access to the building. He used confidential information from the Bank's Specialized Finance Department and profited considerably from the trades. He opened an account in Sanchou's name and one in his own name into which he deposited the profits.

The SEC sought and obtained an ex parte temporary restraining order which included an asset freeze. Cherif invoked the Fifth Amendment during his deposition. He did not provide the accounting the court had also required in the TROs. The court entered a preliminary injunction against Cherif, "using Cherif's silence to draw inferences adverse to him." *Id.* at 407.

Sanchou did not respond to the SEC complaint. The district court entered a preliminary injunction based on his default, freezing the funds and requiring an accounting. Both Cherif and Sanchou appealed. Sanchou argued that the district court lacked subject matter jurisdiction over him as a non-violator. *Id.*

The Seventh Circuit rejected the SEC's position that the securities laws authorized an asset freeze against a non-party. *Id.* at 413–14. The court then explained:

A court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits

but has no legitimate claim to them. Courts have jurisdiction to decide the legitimacy of ownership claims made by non-parties to assets alleged to be proceeds from securities laws violations. [citation omitted]. If the non-party has no ownership interest in the disputed assets, equitable relief can be sought from the non-party. [citation omitted] ... the SEC's mere assertion of Sanchou's nominal status cannot justify the entry of a freeze order. The injunction was properly issued against Sanchou only if the court on remand finds that the complaint's characterization of Sanchou as a "nominal" defendant is correct because Sanchou has no proper claim to his accounts.

*Id.* at 414 n. 11. The court further explained that the SEC could recover the funds in Sanchou's accounts by using the "nominal defendant" concept or by pursuing him as a "full" defendant. The SEC had to choose, though, because the two theories are contradictory. The court added: "If Sanchou's accounts were never meant to be anything but the means for Cherif to carry out his scheme, the injunction is valid because Sanchou is properly termed a 'nominal defendant.' If Sanchou, as some of the facts suggest and as the district court seems to believe, is himself implicated in Cherif's scheme, the injunction must be vacated." *Id.* at 415.

In its description of the nominal defendant concept, the Seventh Circuit noted that such a defendant is not a real party in interest, thus obviating the need for subject matter jurisdiction over him. The nominal defendant lacks an ownership interest in the property that is the subject of the litigation, but can be joined because he possesses the funds as a "trustee, agent, or depositary[.]" Moreover, "[h]is relation to the suit is merely incidental[.]" *Id.* at 414.

The Seventh Circuit sent the case back to the district court for a determination of Sanchou's status, stating that the SEC could not have it both ways: "It cannot continue to name Sanchou as a 'nominal defendant' to excuse itself from having to establish subject matter jurisdiction, while at the same time implying strongly that Sanchou is a violator of the securities laws." *Id.* at 415. In the

instant case, the SEC has eliminated all references to Colello's purported wrongdoing, suing him only as a nominal defendant, that is, one who has been unjustly enriched.

Two district court decisions provide additional guidance in the case of nominal defendants. In *SEC v. Egan*, 856 F.Supp. 401 (N.D.Ill.1993), certain relief defendants opposed the SEC's request for an order of disgorgement and declaration of constructive trust against them. The court noted the "clearly established legal principles that control here," including the fact that the SEC had standing to obtain the equitable remedies of disgorgement and constructive trust based on "its duty to advance the public interest, something that is really separate and apart from (although it may frequently concur with) the interest of injured investors." 856 F.Supp. at 401–02. The court found no meaningful difference between a wrongdoer and a third party for purposes of the disgorgement remedy: "the deterrence purpose is not dependent on that status—for it is just as important to discourage illegal conduct by taking the proceeds of that illegality from those who have given no current value for the ill-gotten gains that have been turned over to them (even though they themselves have not directly engaged in the illegal activity)." *Id.* at 402 n. 3. The point was to prevent unjust enrichment. *Id.* at 402.

In *SEC v. Antar*, 831 F.Supp. 380 (D.N.J. 1993), the SEC filed a claim for constructive trust and unjust enrichment against Deborah Antar and her five children as nominal defendants, alleging no securities law violations against them. Antar was the ex-wife of Eddie Antar, who was a defendant in an SEC action. The basis for the action against Deborah Antar and the children was their possession, that is Mrs. Antar's custody of the proceeds, of Mr. Antar's sale of stock in violation of the securities laws.

The court found that it did have subject matter jurisdiction, citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287–88, 61 S.Ct. 229, 233, 85 L.Ed. 189 (1940). The district court explained that the Supreme Court had held jurisdiction over third parties to be proper "based on the intention underlying the 'Act as a whole' and the unavoidable

implication that the Act intended 'the power to make effective the right of recovery afforded by the Act.'" 831 F.Supp. at 399. The court also cited *Cherif* and other cases that found subject matter jurisdiction to exist against third parties. The court explained:

> According to *Cherif*, a district court has power to grant relief with respect to property to which non-violators have no valid claim. Under these circumstances, the touchstone is whether the non-party's claim to the property is legitimate, not whether the party is innocent of fraud or wrongdoing.

*Id.* Reviewing the evidence, the court determined that Mr. Antar had controlled the funds in the custodial account. The SEC's efforts to recover the illegal profits was appropriate:

> The nominal defendants cannot keep money that is not theirs. This Court has jurisdiction over illegal profits regardless of whether Eddie Antar fraudulently traded for himself or, instead, generated the illegal profits for his children by using an 'estate planning device' that he created.

*Id.* at 402.

The court further explained that under the constructive trust or unjust enrichment theories, the nominal defendants could not keep the funds:

> Unjust enrichment is present here. The nominal defendants should not be allowed to retain funds that are the product of Eddie Antar's securities fraud. Their enrichment came at the expense of defrauded investors. As between the nominal defendants and the victims of fraud, equity dictates that the rights of victims should control. At a minimum, Eddie Antar gave his children a gift from a fraud perpetrated on public investors. The circumstances dictate that, in equity and good conscience, the nominal defendants are required to return the gift to the victims. The Court concludes that the nominal defendants should be ordered to disgorge the illegal profits arising from Eddie Antar's sale of the custodial stock.

*Id.* at 402–03. The court in *Antar* thus focused less on whether the SEC had properly alleged that Deborah Antar was a nominal rather than a "full" defendant and far more on remedying unjust enrichment. Doing equity was the Court's priority.

Here, Colello's receipt of investor monies for an alleged purpose that was never disclosed to the investors, together with his assertion of his Fifth Amendment privilege in response to questions about his ownership claims, demonstrate the absence of any legitimate call on the funds. Until now, the Court has declined to draw an adverse inference against Colello based on his invocation of the Fifth Amendment, although such an inference would have been proper earlier in this civil case. Colello cannot continue to have it both ways. That is, he cannot refuse to provide the necessary information and insist that he "owns" the funds despite the Court's findings, above, that defendants had no right to transfer monies to Colello, particularly for purposes that were never disclosed to the investors. As a result, these sums qualify as "ill-gotten." Colello unquestionably has the right to assert his Fifth Amendment right in this proceeding as in any other. He can no longer, however, ignore the consequences of doing so. The Court hereby finds that Colello has been unjustly enriched at the expense of the CFS investors and as between their interests and his, those of the investors must prevail. Colello must disgorge the CFS investor funds he received. His motion to dismiss or for summary judgment is denied, and the SEC's request for disgorgement is granted.

## E. *The SEC's Motion Against Siemens*

It is uncontroverted that defendant Siemens, like defendants Cross, Franklin, and Fox, violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and e(c), as they either directly sold, or were necessary participants in, the offer and sale of CFS's unregistered promissory notes, and used the means and instrumentalities of interstate commerce in such offers and sales. *See SEC v. Rogers*, 790 F.2d 1450, 1456 (9th Cir.1986); *Anderson v. Aurotek*, 774 F.2d 927, 929 (9th Cir.1985); *SEC v. Murphy*, 626 F.2d 633, 649–50 (9th Cir.1980). And, as with the other defendants, Siemens, too, violated Section 17(a) of the Securities Act, 15

U.S.C. § 77q(a), by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities in the form of notes or investment contracts, by the use of means or instruments of transportation or communication in interstate commerce or of the mails: (1) with scienter, employed devices, schemes or artifices to defraud; (2) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities. He similarly violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5.

Siemens' conduct was necessary to and a substantial factor in the offer and sale of unregistered securities and misappropriation of the investor funds. *SEC v. Murphy,* 626 F.2d 633, 649–50 (9th Cir.1980). He planned the CFS program with Cross and Franklin from conception to execution. He was involved every step of the way and was more than a motivating factor behind the sales, which supports the judgment of liability that the SEC has requested.

Specifically, the SEC has demonstrated, and Siemens has not established any material dispute regarding the following:

1. Siemens devised the scheme for creating CFS to acquire investment dollars and directed, among others, Cross and Franklin in implementing the "program."

2. Siemens not only obtained "references" to include in the CFS offering brochure(s), but acted as one himself. In one important instance, one of CFS's largest investors has stated that without Siemens' reassurances, he would not have invested.

3. Siemens represented at various times that he possessed the authority to direct CFS's activities.

4. Siemens knowingly received substantial sums as "commissions" without any written agreement with CFS and knowing that such fees were never disclosed to the investors.

5. Siemens used the investor funds he should never have received in the first instance to, among other things, make loans at usurious interest rates.

Siemens was a substantial participant in the offer and sale of CFS's unregistered securities, if not the key figure in the entire scheme. The SEC is thus entitled to judgment against Siemens based on his role as the creator and manager of the CFS program, that is, as a necessary and substantial factor in the unlawful transactions. *SEC v. Rogers,* 790 F.2d at 1456, 1457.

■ The SEC has also established that Siemens violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5. Siemens made blatant misrepresentations to investors and misappropriated substantial sums of investor funds. The SEC has shown that Siemens knowingly paid investor funds to himself or authorized and/or enabled payments to be paid to others, notably Colello, which were never disclosed to the investors. As noted above, Siemens also acted as a reference for CFS in his conversations with investors, and with respect to each of them, omitted facts or misrepresented others. Investor Buschman, for example, stated that Siemens' representations were material to his decision to invest in CFS. Siemens' efforts were also important in enabling the CFS operation to appear legitimate to investors. Notably, Siemens sought American Credit Indemnity's approval to list it in the CFS brochure to make the investment seem safe. Siemens also walked Cross through the mechanics of setting up the company and advised him on sales strategies.

Most important, of course, was Siemens' free-wheeling use of investor funds. Whether obtaining what can only be viewed as a facially questionable LC from Bank Ukraina or loaning or arranging for usurious loans to entities having nothing to do with CFS's purpose, Siemens treated the investor monies as *personal* funds. There is no dispute

that he knew what he was doing. And as the SEC notes, even if the Court were to accept his claim that he was simply a "fiduciary," he thereby admits to a heightened duty of care which he breached by his recklessness.

The SEC has thus established that defendant Siemens acted with the degree of recklessness that, in the Ninth Circuit, will evidence scienter. *Hollinger v. Titan Capital Corp.*, 914 F.2d at 1568–69. If his very use of investor funds for purposes other than those disclosed to the investors were not "reckless" enough to satisfy the scienter requirement, then the nature of Siemens' misappropriations certainly fills any gap. He made or arranged for CFS to make usurious loans, paid exorbitant commissions to himself and others, and participated in the acquisition of worthless letters of credit *with* investor monies.[7] If he did not set out to "steal" investor monies, this was the predictable effect of his recklessness. The scienter requirement is satisfied here.

#### F. *Propriety of Requested Relief*

■ There is no dispute that injunctive relief is warranted. Without an injunction, there is every reason to believe that defendants will engage in the above activities again. In fact, as the SEC notes, before CFS, Siemens and Franklin were involved as consultants for ACF in factoring. (Of course, CFS never engaged in any factoring, although this was its express business purpose.) Fox, Franklin, Cross, and Siemens acted with a high degree of scienter in knowingly orchestrating and participating in the fraudulent scheme. No defendant has admitted responsibility,[8] and the Court thus has no basis for finding that any one of the defendants intends to comply with the securities laws in the future. Moreover, Cross, Frank-

lin, Fox, and Siemens have not challenged the propriety of the requested relief or the particular sums the SEC has sought. Under these circumstances, a permanent injunction, in the form the Commission requested, is concededly necessary and appropriate.

■ As for the disgorgement request, this type of equitable relief prevents unjust enrichment. *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 439, 126 L.Ed.2d 372. The amount of disgorgement should include all gains flowing from the illegal activities. *See SEC v. Lund*, 570 F.Supp. 1397, 1404 (C.D.Cal.1983). The ill-gotten gains include prejudgment interest to ensure that the wrongdoer does not profit from the illegal activity. *SEC v. Lund*, 570 F.Supp. at 1404. Generally, unless the Court finds otherwise, the appropriate rate at which to calculate prejudgment interest is the same rate as mandated by 28 U.S.C. § 1961 for post-judgment interest. *Western Fisheries, Inc. v. S.S. President Grant*, 730 F.2d 1280, 1289 (9th Cir.1984).

#### G. *Joint and Several Liability*

■ When defendants act collectively, as here, joint and several liability is appropriate. *See Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir.1993) (joint and several liability is appropriate between defendants who acted collectively or defendants who were controlling or controlled persons). Defendants were in close contact, collaborated in developing the investment scheme, worked together on the offering materials, and assented to the misuse of investor funds. Defendants have not opposed the applicability of joint and several liability, except with respect to Colello. Although the concern regarding joint and several liability between a "relief" and a

---

7. This "double whammy" is unconscionable. Not only did CFS fail to invest as represented, but it actively jeopardized the security of the investment dollars by using them to purchase the letters of credit.

8. In Siemens' case, he began by answering the Commission's questions, then asserted his Fifth Amendment right against self-incrimination, then requested an extension of the discovery cut-off to allow (force) the SEC to take his deposition, then submitted two declarations here, after the discov-

ery cut-off had passed. In numerous instances, the latest declarations contradicted Siemens' own investigative testimony. He cannot, of course, create a genuine issue of material fact in this manner, and the Court has relied on his initial testimony, before he commenced the strategic maneuvering just described. In any event, his inconsistency and his attempts to create disputed factual issues by contradicting his own deposition testimony would suggest that he is not a candidate for leniency.

"full" defendant is well-taken, the Court finds that as between the full defendants, joint and several liability *is* appropriate.

## H. *The Amounts Requested*

The SEC has established that there is no dispute as to the amounts the defendants owe, including the prejudgment interest.[9] From March 1993 through November 1993, when Cross was president of CFS, the company received $9,413,295.21 from investors and paid $763,176.83 to investors. The net receipts during this period were $8,650,118.38.

From December 1993 through June 1994 (Fox's tenure), CFS received $13,283,634.41 from investors and paid $5,504,967.42 to investors. CFS's net receipts during this period were $7,778,666.99.

Defendant Fox received $7,850,710.09, of which he is jointly and severally liable with defendant Cross for $72,043.10 and the applicable pre-bankruptcy petition interest. Fox is also jointly and severally liable with Defendant Franklin for $2,035,590.33 of the $7,850,710.09, along with prejudgment interest.

Defendant Franklin received $357,395.88, of which amounts he is jointly and severally liable with Cross for $357,395.88, plus $38,709.79 in pre-bankruptcy petition interest.

Defendant Siemens received $6,594,077.09, of which amounts he is jointly and severally liable with: (1) defendant Cross for $2,416,383.21, plus $275,395.06 in pre-bankruptcy petition interest; (2) defendant Franklin for $357,095.88 plus prejudgment interest, of which amounts Siemens and Franklin are also jointly and severally liable with Cross for $357,095.88 and $38,678.34 in pre-bankruptcy petition interest; (3) defendant Fox for $707,743.00, and $48,828.69 in prejudgment interest; and (4) defendants Fox and Franklin for $492,257.00 and $40,200.71 in prejudgment interest.

Relief defendant Colello received $2,620,598.00 to which he was not entitled.

And, as for defendant Cross, he received $8,650,118.38, and is liable for pre-bankrupt-cy petition interest in the amount of $935,323.75. Cross is jointly and severally liable with Fox for $72,043.10 of that sum, not counting pre-bankruptcy petition interest. Cross is jointly and severally liable with Franklin for another $357,395.88 of that amount, and pre-bankruptcy petition interest thereon. And Cross is also jointly and severally liable with Siemens on $2,416,383.21 of the gross figure, plus $275,395.06 in pre-bankruptcy petition interest.

## IV

### *CONCLUSION*

For the reasons set forth above, the Court hereby grants the SEC's motion for summary judgment and denies Colello's motion to dismiss or for summary judgment.

### *ORDER*

**THE COURT HEREBY ORDERS:**

1. Plaintiff Securities and Exchange Commission's motions for summary judgment against defendants Douglas S. Cross, Bruce Franklin, Owen R. Fox, and Carroll E. Siemens are granted and Defendant Michael J. Colello's motion to dismiss or for summary judgment is **denied.**

2. Defendants Fox, Franklin, Cross, and Siemens and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, and each of them, are permanently restrained and enjoined from, directly or indirectly:

   a. making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell the securities of any issuer, through the use or medium of any prospectus or otherwise, unless and until a registration statement is in effect as to such securities;

   b. carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of

9. The SEC has submitted declarations supporting its calculations of prejudgment interest through July 31, 1995.

transportation, the securities of any issuer, for the purpose of sale or for delivery after sale, unless and until a registration statement is in effect as to such securities; and

c. making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of any prospectus or otherwise, the securities of any issuer, unless and until a registration statement has been filed with the Commission as to such securities, or while a registration statement as to such securities is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding of examination under Section 8 of the Securities Act, as amended, [15 U.S.C. § 77(h)];

in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & 77e(c)].

3. Defendants Fox, Franklin, Cross, and Siemens and their agents, servants, employees and attorneys, and all persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, and each of them, are permanently restrained and enjoined from, directly or indirectly, in the offer or sale of the securities of any issuer, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails:

a. employing any device, scheme or artifice to defraud;

b. obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c. engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser;

in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

4. Defendants Fox, Franklin, Siemens, and Cross, and their agents, servants, employees and attorneys, and all persons in active concert or participation with any of them, who receive actual notice of this Order by personal service or otherwise, and each of them, are permanently restrained and enjoined from, directly or indirectly, in connection with the purchase or sale of the securities of any issuer, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange:

a. employing any device, scheme, or artifice to defraud;

b. making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c. engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security;

in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b–5 thereunder [17 C.F.R. § 240.10b–5].

5. Disgorgement and prejudgment interest shall be paid as follows:

a. Defendant Fox shall pay disgorgement in the amount of $7,850,710.09, representing his ill-gotten gains, plus prejudgment interest thereon in the amount of $663,728.42. Of these amounts, Fox is jointly and severally liable with Defendant Cross for $72,043.10 in disgorgement and $7,779.33 in pre-bankruptcy petition interest. Fox is also jointly and severally liable with Defendant Franklin for $2,035,590.33 in disgorgement and $164,899.30 in prejudgment interest.

b. Defendant Franklin shall also pay disgorgement in the amount of $357,395.88, representing his ill-gotten gains, plus prejudgment interest thereon in the amount of $39,711.76, of which amounts he is jointly and severally liable with Cross for $357,395.88 in disgorgement

and $38,709.79 in pre-bankruptcy petition interest.

c. Defendant Siemens shall pay disgorgement in the amount of $6,594,077.09, representing his ill-gotten gains, plus prejudgment interest thereon in the amount of $756,899.69, of which amounts he is jointly and severally liable with: (1) defendant Cross for $2,416,383.21 in disgorgement and $275,395.06 in pre-bankruptcy petition interest; (2) defendant Franklin for $357,095.88 in disgorgement and $39,680.31 in prejudgment interest, of which amounts Siemens and Franklin are also jointly and severally liable with Cross for $357,-095.88 in disgorgement and $38,678.34 in pre-bankruptcy petition interest; (3) defendant Fox for $707,743.00 in disgorgement and $48,828.69 in prejudgment interest; and (4) defendants Fox and Franklin for $492,257.00 in disgorgement and $40,200.71 in prejudgment interest.

d. Relief defendant Colello shall pay disgorgement in the amount of $2,620,598 and $276,954.63 in prejudgment interest.

6. The Court hereby fixes the amount of defendant Cross's disgorgement at $8,650,-118.38, representing his ill-gotten gains, and pre-bankruptcy petition interest thereon is fixed in the amount of $935,323.75 against Cross. These amounts include the $72,043.10 in disgorgement and the $7,779.33 in pre-bankruptcy petition interest for which Cross is jointly and severally liable with Fox; $357,395.88 in disgorgement and $38,709.79 in pre-bankruptcy petition interest for which Cross is jointly and severally liable with Franklin; and $2,416,383.21 in disgorgement and $275,395.06 in pre-bankruptcy petition interest for which Cross is jointly and severally liable with Siemens. So long as Cross remains the subject of the bankruptcy proceeding entitled *In re Douglas S. Cross,* Case No. SA95–15228 JB, Bankr.C.D.Cal., any attempts to collect the disgorgement and pre-bankruptcy petition interest from assets included in the bankruptcy estate shall be in that bankruptcy proceeding.

7. The above disgorgement and prejudgment interest for which Defendants Fox, Franklin, Cross, and Siemens are liable shall be immediately deposited with the Receiver for CFS appointed by this Court, Richard G. Shaffer. With regard to the amounts owed by Fox, all rights to, title to and possession of his assets frozen pursuant to the Court's July 26, 1994, Order of Preliminary Injunction And Other Relief Against Defendants Owen R. Fox, Carroll E. Siemens And Douglas S. Cross, shall be transferred to the Receiver, except to the extent that the value of those assets exceeds the amount of disgorgement and prejudgment interest Fox owes. Similarly, with regard to defendant Franklin, all rights to, title to and possession of his assets frozen pursuant to the Court's June 23, 1994 Temporary Restraining Order and Orders: 1) Freezing Assets; 2) Prohibiting the Transfer of Assets and Destruction of Documents; 3) Appointing a Receiver; 4) For an Accounting and an Order to Show Cause Why a Preliminary Injunction Should Not Be Granted and the Temporary Orders Should Not Continue, and Waiving the Notice Requirements of Local Rule 7.18.1 and the Court's July 5, 1994, Supplemental Order Freezing Assets Against Bruce Franklin aka Bruce Aaron Beckner And/Or Bruce Becker shall be transferred to the Receiver, except to the extent that the value of those assets exceeds the amount of disgorgement and prejudgment interest Franklin owes.

8. Within ten days from the date of this Order, Colello shall pay to the Receiver by cashier's or certified check the full amounts of disgorgement and prejudgment interest he owes.

9. With the exception of the transfers to the Receiver specified above, and until the making of the transfers to the Receiver as required above, Colello, and all persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise, including his officers, agents, servants, employees, and attorneys, and each of them, shall hold and retain within their control, and otherwise prevent any concealment, disposition, transfer, or dissipation whatsoever of any assets, funds, or other property subject to the preceding paragraph presently held in the name of Colello, for his benefit, under his control, or over which he

exercises actual investment or other authority (including signatory authority).

11. The Court shall retain jurisdiction over this action for the purposes of enforcing the terms of this Order, the accompanying Judgment and any other decrees herein, and entertaining any suitable application or motion for additional relief within the jurisdiction of this Court.

Pursuant to Fed.R.Civ.P. 54(b), the Court hereby finds that there is no just reason to delay entry of judgment against defendants Cross, Fox, Franklin, Colello, and Siemens, and directs that judgment be entered against them forthwith.

IT IS SO ORDERED.